# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| DELTA AIR LINES, INC.,<br>1030 Delta Boulevard<br>Atlanta, GA 30320-6001;<br><br>HAWAIIAN AIRLINES, INC.,<br>3375 Koapaka Street, #G-350<br>Honolulu, HI 96819; and<br><br>AIR LINE PILOTS ASSOCIATION, INT'L,<br>1625 Massachusetts Avenue, N.W., 8th Floor<br>Washington, D.C. 20036,<br><br>Plaintiffs,<br><br>v.<br><br>EXPORT-IMPORT BANK OF THE<br>UNITED STATES; FRED P. HOCHBERG,<br>in his Official Capacity as Chairman and<br>President of the Export-Import Bank of the<br>United States; WANDA FELTON, in her<br>Official Capacity as First Vice President and<br>Vice Chair of the Export-Import Bank of the<br>United States; SEAN MULVANEY,<br>PATRICIA M. LOUI, and LARRY<br>WALTHER, in their Official Capacities as<br>Members of the Board of Directors of the<br>Export-Import Bank of the United States,<br>   811 Vermont Avenue, N.W.<br>   Washington, D.C. 20571,<br><br>Defendants. | Civil Action No. 13-424 |

# COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Delta Air Lines, Inc. ("Delta"), Hawaiian Airlines, Inc. ("Hawaiian"), and the

Air Line Pilots Association, International ("ALPA") (collectively, "Plaintiffs") allege as follows:

### NATURE OF THE CASE

1.      Defendant Export-Import Bank of the United States ("Ex-Im Bank" or the

"Bank") is a federal agency and a wholly owned U.S. government corporation that provides

loans, loan guarantees, and insurance commitments to foreign corporations.  The Bank's

obligations carry the full faith and credit of the U.S. government.  They are meant to be used for

the overall net benefit of U.S. industry and employment by promoting exports.

2.      When the Bank subsidizes exports, its actions can and do have negative impacts

on other U.S. companies and their employees by subsidizing their foreign competitors.  To

prevent the Bank from doing more harm than good, Congress has directed the Bank to consider

the adverse economic impact of its actions.

3.      One of the types of exports that the Bank subsidizes frequently and heavily is the

export of aircraft by U.S. manufacturers and in particular by The Boeing Company ("Boeing").

In FY2012, the Bank's total exposure to outstanding financial commitments was $106.6 billion.

Approximately 46% of this amount was for air transportation loans and loan guarantees—more

than the three next-largest industrial sectors combined.

4.      U.S. airlines and their employees, including Plaintiffs, have protested that the

Bank's subsidies to foreign airlines to help them buy Boeing planes cause adverse economic

effects on U.S. airlines and their employees.  Plaintiffs contend that the Bank is legally required

to consider these adverse economic effects, that it has failed to do so, and that its failure to do so

has led it to approve more financial assistance to airlines than it would have if it had complied

with its statutory requirements.

5.      Delta and ALPA are parties to a recent case challenging the Bank's practice of disregarding the adverse economic impacts of the aircraft transactions it subsidizes.  *See Air Transp. Ass'n of Am. v. Export-Import Bank of the United States*, 878 F. Supp. 2d 42 (D.D.C. 2012) ("*ATA*"), *appeal pending*, No. 12-5294 (D.C. Cir.).  In *ATA*, Judge Boasberg found on summary judgment that domestic airlines had standing to sue the Bank and that the Bank's financing decisions were subject to judicial review, but that the Bank had properly interpreted its statutory mandate to permit it to exempt from substantive economic impact analysis any transaction which did not result in the foreign production of an "exportable good."  That determination is now on appeal before the D.C. Circuit.

6.      While the *ATA* case was pending, Congress passed the Export-Import Bank Reauthorization Act of 2012 ("Reauthorization Act"), Pub. L. No. 112-122, 126 Stat. 350. Among other things, the Reauthorization Act requires the Bank to "develop and make publicly available methodological guidelines to be used by the Bank in conducting economic impact analyses or similar studies."  *Id.* § 12, 126 Stat. at 357.  It also requires the Bank to give public notice and respond to comments on certain large export transactions exceeding $100,000,000 in value, and to include in its notice a description of whether the exported "item may be used to . . . provide services in competition with . . . the provision of services by a United States industry." *Id.* § 9, 126 Stat. at 354-55.

7.      Since the enactment of the Reauthorization Act, Ex-Im Bank has approved applications (collectively, the "Widebody Applications") for loan guarantees to support purchases of widebody aircraft by at least the following foreign airlines:  Emirates Airlines ("Emirates"), a foreign airline owned by the government of Dubai; LOT Polish Airlines ("LOT"), the national flag carrier of Poland and that country's largest airline; Etihad Airways

("Etihad"), a foreign airline owned by the government of Abu Dhabi; LATAM Airlines Group

("LATAM"), a foreign airline formed in 2012 when LAN, the national flag carrier of Chile,

acquired TAM, the national flag carrier of Paraguay; and Korean Air Lines ("Korean Air"), the

national flag carrier of South Korea and that country's largest airline.

8.     Each of these foreign airlines competes directly with U.S. airlines for passengers

flying internationally, through competition on nonstop routes or on connecting routes, or both.

And each of these foreign airlines uses Ex-Im Bank's subsidies to enhance its competitive

position vis-à-vis U.S. airlines on those competing routes.

9.     Even before these approvals, Ex-Im Bank had approved more than $13.5 billion

in loan guarantees to help these five airlines (or, in LATAM's case, its predecessor airlines)

acquire Boeing aircraft over the past 15 years, to the detriment of U.S. airlines and their

employees.

10.     Each of the new financings approved by the Bank will harm U.S. airlines and

their employees as well.  Because Ex-Im Bank loan guarantees lower their cost of capital, these

foreign airlines will recoup their investment in their new aircraft faster or reduce ticket prices on

competing routes without adversely impacting their relative rate of return on those investments.

Either way, unsubsidized U.S. airlines will be forced to respond by reducing their prices and

reducing or altogether eliminating their capacity to serve those routes where they compete with

Bank-subsidized foreign airlines.

11.     Prior to approving each Widebody Application, the Bank sought public comment,

pursuant to a new requirement in the Reauthorization Act, *see* 35 U.S.C. § 635a(c)(10)(C), on the

potential negative impact of each transaction on U.S. industry and employment.  For all but the

LOT transaction, the Bank acknowledged that the subsidized aircraft "may be used to produce

exports or provide services in competition with the exportation of goods or the provision of services by a United States industry."

12.     Delta and ALPA submitted comments for all of these transactions, detailing how each would harm U.S. airlines and their employees.  Hawaiian joined the comments for the Korean Air and LATAM transactions.  *See* Exs. 1-5 ("Plaintiffs' comments").

13.     For each transaction, the Bank summarily ignored Plaintiffs' comments and performed no meaningful economic impact analysis.  In all five instances, the Bank made the conclusory assertion that, "in accordance with Ex-Im Bank's policies and procedures in effect when this case was authorized, economic impact considerations were deemed inapplicable and no detailed economic impact analysis was conducted."  *See* Exs. 6-10.

14.     The Bank's approval of these guarantees for widebody aircraft, without any consideration of Plaintiffs' comments and the adverse effects on U.S. industry and employment that the guarantees will have, violates the Bank's Charter, the Export-Import Bank Act of 1945 ("Bank Act"), as amended by the Reauthorization Act (codified at 12 U.S.C. § 635 *et seq*.), and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.

15.     Plaintiffs ask this Court to hold unlawful and set aside the Bank's approval of the Widebody Applications.

## JURISDICTION AND VENUE

16.     This is an action seeking relief under the APA, 5 U.S.C. § 702.  The Court has subject-matter jurisdiction over such an action under 28 U.S.C. § 1331 because it arises under the laws of the United States.

17.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e) because this is an action against an agency of the United States, and at least one defendant resides in this district.

## PARTIES

18.     Plaintiff Delta is an airline that provides scheduled air transportation for passengers and cargo throughout the United States and around the world.  Delta's global route network gives it a presence in every major domestic and international market.  Delta's route network is centered around the hub system that it operates in several major cities, including Amsterdam, Atlanta, Cincinnati, Detroit, Memphis, Minneapolis-St. Paul, New York-LaGuardia, New York-JFK, Paris-Charles de Gaulle, Salt Lake City, and Tokyo-Narita.  Each of these hub operations includes flights that gather and distribute traffic from markets in the geographic region surrounding the hub to domestic and international cities and to other hubs.

19.     Delta is a Delaware corporation that has its headquarters in Atlanta, Georgia.

20.     Plaintiff Hawaiian is an airline based in Honolulu, Hawaii, that provides scheduled air transportation for passengers and cargo.  Hawaiian has been in continuous operation for 84 years and is the largest provider of passenger air service from and to Hawaii's primary visitor markets on the U.S. mainland.  Hawaiian offers more nonstop service between Hawaii and U.S. gateway cities (11) than any other airline, along with service from and to Japan, South Korea, the Philippines, Australia, American Samoa, and Tahiti.  Hawaiian also provides approximately 170 daily jet flights between the Hawaiian Islands.

21.     Hawaiian is a Delaware corporation with its headquarters in Honolulu, Hawaii.

22.     Plaintiff ALPA is an unincorporated labor organization representing approximately 47,000 pilots employed by 28 U.S. commercial airlines.  Among the pilots

represented by ALPA are those who work for airlines that provide significant international services (including Alaska, United, Delta, FedEx, and Hawaiian) (hereinafter for convenience "ALPA Pilots").  ALPA has an international headquarters office in Washington, D.C.

23.     Defendant Ex-Im Bank is the official export credit agency ("ECA") of the United States.  The Bank is headquartered in Washington, D.C.  The Bank offers working capital guarantees, export credit insurance, direct loans, and loan guarantees to benefit U.S. exporters.

24.     Defendant Fred P. Hochberg is the Bank's President and Chairman.  He has overall responsibility for assuring the Bank's compliance with the law.  He voted to approve some or all of the Widebody Applications.  He is sued in his official capacity only.

25.     Defendant Wanda Felton is the Bank's First Vice President and Vice Chair.  She voted to approve some or all of the Widebody Applications.  She is sued in her official capacity only.

26.     Defendants Sean Mulvaney, Patricia M. Loui, and Larry Walther are members of the Bank's Board of Directors.  Defendants Mulvaney, Loui, and Walther all voted to approve some or all of the Widebody Applications.  They are sued in their official capacities only.

## STATUTORY FRAMEWORK

27.     President Franklin D. Roosevelt established the original Export-Import Bank of Washington during the Great Depression in order to "reduce and relieve unemployment, to improve standards of labor, and otherwise to rehabilitate industry" by increasing U.S. exports. Exec. Order No. 6581 (Feb. 2, 1934), 12 C.F.R. § 401, *reprinted as amended in* 12 U.S.C. § 635. Congress turned the corporation into an "agency of the United States" and codified its powers in the Bank Act, under which the Bank's "objective" in making loans, loan guarantees, and other commitments continues to be "maintaining or increasing employment of United States workers."

12 U.S.C. § 635(a)(1).  The Bank Act further expresses "the policy of the United States that the Bank in the exercise of its functions should supplement and encourage, and not compete with, private capital."  *Id.* § 635(b)(1)(B).

28.     The Bank Act authorizes Ex-Im Bank to extend various types of commitments to foreign buyers, including direct loans and loan guarantees, but expressly requires that such commitments comply with several procedural requirements and substantive prohibitions.  *Id.* § 635(b)(1)(A).

29.     In particular, the Bank Act requires Ex-Im Bank to consider, among other things, the adverse effect its commitments will have on U.S. industries and employment, as well as whether borrowers are able to offer reasonable assurances of repayment.  *Id.* §§ 635(b)(1), 635a-2.

30.     Subsection 635(e) of the Bank Act provides several limitations on the Bank's provision of loans or loan guarantees that "adversely affect[ ] the United States."  One of those limitations is found in § 635(e)(1), which prohibits the Bank from approving loans or loan guarantees that cause "substantial injury" to U.S. companies.  The Bank Act defines "substantial injury" as occurring if "the amount of the capacity for production established, or the amount of the increase in such capacity expanded, by . . . [the Bank's] guarantee equals or exceeds 1 percent of United States production."  *Id.* § 635(e)(4).  Another limitation is found in § 635(e)(7), which imposes certain notice-and-comment obligations "to reduce adverse effects of loans and guarantees on industries and employment in [the] United States."

31.     These safeguards are necessary because Bank-backed loans offer foreign companies extremely favorable terms—backed by the full faith and credit of the U.S.

government—which offer a significant advantage to foreign recipients of the loans that compete against U.S. companies and workers.

32.     The Bank Act requires Ex-Im Bank to maintain a Board of Directors (the "Board").  *See id.* § 635a(c).  Pursuant to the Bank Act, the Board has adopted bylaws that require Ex-Im Bank to, among other things, hold regularly scheduled meetings for transacting business.  *See* Bylaws of Export-Import Bank of the United States art. I, § 2 (effective Aug. 20, 1998), *available at* http://www.exim.gov/about/whoweare/charterbylaws/bylaws.cfm (last visited Mar. 25, 2013).  A majority vote of the Board members attending those meetings (of which three are needed for a quorum) constitutes an action of the Board.  *Id.* art. I, § 5.

33.     The Reauthorization Act imposes a number of additional transparency and accountability requirements on the Bank.  Specifically, Congress required the Bank to provide advance notice of all applications for financing above $100 million and an opportunity for the public to comment.  Reauthorization Act § 9(a), 126 Stat. at 354-55 (codified at 12 U.S.C. § 635a(c)(10)(C)(i)).  The notice must provide "a brief non-proprietary description of the purposes of the transaction and the anticipated use of any item being exported, including, to the extent the Bank is reasonably aware, whether the item may be used to produce exports or provide services in competition with the exportation of goods or the provision of services by a United States industry."  12 U.S.C. § 635a(c)(10)(C)(ii).

34.     The Reauthorization Act also requires the Bank to provide any comments to the Bank's Board before the Board takes final action, *id.* § 635a(c)(10)(E), and to provide to requesting commenters a "non-confidential summary of the facts found and conclusions reached in any detailed analysis or similar study" conducted for the application, *id.* § 635a(c)(10)(F).

35.     Under section 9(b) of the Reauthorization Act, the notice-and-comment provisions described above went into effect on July 30, 2012.

36.     Additionally, the Reauthorization Act required the Bank, by November 27, 2012, to "develop and make publicly available methodological guidelines to be used by the Bank in conducting economic impact analyses or similar studies under section 2(e) of the Export-Import Bank Act of 1945."  Reauthorization Act § 12(a), 126 Stat. at 357.

37.     The APA provides a right of action against government agencies such as Ex-Im Bank where their actions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or "without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (C), (D); *see id.* § 702.

## FACTS AND PROCEDURAL HISTORY

**A.     Ex-Im Bank's Aircraft Financing for Foreign Airlines**

38.     Ex-Im Bank devotes a very substantial portion of its financial commitments to aircraft financing.  From FY2001 to FY2012, the Bank approved more than $67 billion in loan guarantees to foreign carriers and international aircraft lessors.  Those loan guarantees allowed foreign airlines to acquire more than 950 commercial aircraft at below-market rates.

39.     From 2007 to 2010, more than 60% of Ex-Im Bank's total loan-guarantee portfolio was devoted to this purpose.  In FY2012, more than 46% of the Bank's exposure was in the air transportation industry.  The amount of its exposure that the Bank allocates to this sector is more than 2.5 times larger than the next largest sector and is larger than the next three sectors combined.

40.     Ex-Im Bank's financing is not available to U.S. airlines, including Delta, Hawaiian, and the other U.S. airlines that employ pilots represented by ALPA.  Further, under an arrangement between the Bank and European ECAs known as the Home Market Rule, financing from European ECAs is also not available to U.S. airlines.  Accordingly, when U.S. airlines purchase aircraft from Boeing or from its principal European competitor, Airbus, they cannot take advantage of government-backed financing but must instead seek financing from purely private sources.

**B.     Harm Caused to U.S. Airlines and Airline Employees**

41.     The ability to buy Boeing aircraft using loan guarantees backed by the U.S. Treasury gives the favored foreign airlines a significant competitive advantage.  These airlines are able to raise capital more cheaply and on more favorable terms than they otherwise could.  In some cases, foreign airlines are able with the Bank's support to buy aircraft and serve routes that they could not otherwise have financed at all on economically feasible terms.

42.     The new aircraft that foreign airlines acquire with the Bank's assistance also give the foreign airlines competitive advantages by reducing their overall cost structure, including their fuel and maintenance costs; by attracting customers who wish to fly on newer, more desirable planes; and by enabling the airlines to charge prices for seats on the *newer* aircraft that are lower than the prices that U.S. airlines must charge for seats on competitive routes on the *older* aircraft that make up their fleets.

43.     Delta, Hawaiian, and the other U.S. airlines that employ ALPA Pilots compete directly with the favored foreign airlines that enjoy these benefits.  Delta, Hawaiian, and the other U.S. airlines suffer economic harm as a result of the subsidized competition they face.

44.     In order to compete with the favored foreign airlines, U.S. airlines must take steps such as reducing or altogether eliminating their capacity to serve certain routes.  U.S. airlines may also forgo serving routes they would otherwise serve.  These steps harm the U.S. employees that ALPA represents because they lead to lost and displaced jobs and fewer hours available to work.

**C.     The Bank's Economic Impact Procedures**

45.     Since at least April 2007, the Bank has used a set of "Economic Impact Procedures" to govern its evaluation of the economic impact of its export-financing commitments.  These procedures (the "April 2007 Procedures") provide that, prior to conducting any economic impact analysis, the Bank first considers whether the export for which financing is sought is an "export[ ] of capital goods and services (e.g., manufacturing equipment, licensing agreements) that will result in the foreign production of an exportable good."  If an export fails to meet this criterion, the Bank will not consider the economic impact of that particular financed transaction on U.S. industry and employment.

46.     On November 19, 2012, the Bank approved a set of Economic Impact Procedures and Methodological Guidelines, which the Bank will apply to all applications that it evaluates beginning in April 2013 (the "April 2013 Procedures").

47.     The April 2013 Procedures provide, for the first time, a separate process the Bank will use to evaluate the potential adverse economic impact of its loan guarantees to foreign airlines.

48.     Plaintiffs have challenged the April 2013 Procedures and the process the Bank used to adopt them in another suit that remains pending in this Court.  *See Delta Air Lines, Inc. v. Export-Import Bank of the United States*, No. 13-cv-00192-RC (D.D.C. filed Feb. 13, 2013).

**C.      The Bank's Post-Reauthorization Widebody Guarantees**

49.      Since the Reauthorization Act's new notice-and-comment requirements went into

effect, Ex-Im Bank has issued at least five separate notices in the Federal Register for pending

applications for loan guarantees of more than $100 million to support the export of Boeing

widebody aircraft to foreign airlines.  *See* Export-Import Bank, Pub. Notice 2012-0501, 77 Fed.

Reg. 58,139 (Sept. 19, 2012) (the "Emirates Notice"); Export-Import Bank, Pub. Notice 2012-

0502, 77 Fed. Reg. 58,139 (Sept. 19, 2012) (the "LOT Notice"); Export-Import Bank, Pub.

Notice 2012-0546, 77 Fed. Reg. 74,010 (Dec. 12, 2012) (the "Etihad Notice"); Export-Import

Bank, Pub. Notice 2013-0101, 78 Fed. Reg. 2672 (Jan. 14, 2013) (the "Korean Air Notice");

Export-Import Bank, Pub. Notice 2013-0102, 78 Fed. Reg. 2673 (Jan. 14, 2013) (the "LATAM

Notice") (collectively, the "Widebody Notices").

50.      In every Widebody Notice, the Bank assured the public that comments received

on or before the due date would be "presented to the Ex-Im Bank Board of Directors prior to

final action on [the] Transaction" and that timely comments would be "assured of consideration

before final consideration of the transaction by the Board of Directors of Ex-Im Bank."

51.      In every Widebody Notice, the Bank announced that the exported aircraft to be

supported by the applied-for loan guarantees would be used for long-haul passenger service (or,

in the case of Korean Air, for long-haul passenger and cargo service).

52.      In every Widebody Notice but the LOT Notice, the Bank announced that the

exported aircraft "may be used to produce exports or provide services in competition with the

exportation of goods or provision of services by a United States industry."

53.      Delta and ALPA submitted comments in response to each Widebody Notice.

Hawaiian joined the comments in response to the Korean Air and LATAM Notices.  Each set of

comments included a supporting declaration from Daniel Kasper and Eric Amel, economists with substantial expertise in the airline industry, as well as supporting exhibits.  *See* Exs. 1-5.

54.     Plaintiffs' comments opposed the proposed guarantees and set forth arguments and evidence expressing concern about the substantial harm that those guarantees, if approved, would have on U.S. airlines and their employees.  Those concerns included the following points:

a.      Delta and ALPA's comments in response to the Emirates Notice (Ex. 1) showed that Ex-Im Bank's guarantee would facilitate the export of advanced Boeing 777 aircraft at below-market rates to Emirates, a major global competitor to U.S. airlines. The Emirates Comments explained that Emirates had already received more than $2.5 billion in loan guarantees from the Bank since 2004 and had rapidly expanded its U.S. destinations during that same period, and that Emirates competed with U.S. airlines on 301 different international routes accounting for nearly $2 billion in annual revenue for U.S. airlines.  Additionally, Delta and ALPA explained that, if Emirates were to add a daily nonstop route between Chicago and its hub in Dubai, a move the airline has suggested it will make, it would capture roughly 20% of the passengers that currently use U.S. airlines to travel on competing routes (or more than 37,000 passengers), amounting to $26-57 million in U.S. airline revenue each year.

b.      Delta and ALPA's comments in response to the LOT Notice (Ex. 2) showed that the Bank's guarantee would facilitate the export of advanced Boeing 787 aircraft at below-market rates to LOT.  The LOT Comments explained that LOT had already announced plans to use newly purchased Boeing 787s to provide nonstop service between Warsaw and both Chicago and New York, and that this expansion of service would be supported by the Bank's approval of the LOT Application.  The Comments

further showed that if LOT were to add even one additional aircraft to provide service between Poland and the United States, the increased capacity would directly compete with U.S. airlines that provide connecting service to Poland and other international destinations.

c.       Delta and ALPA's LOT Comments further demonstrated that the Bank's financial support was not necessary for LOT to obtain export financing and would not advance any of the statutory purposes for providing such financing enumerated in 12 U.S.C. § 635g(h), and thus that a loan guarantee to LOT would contravene Congress's stated policy that the Bank refrain from competing with private capital.  *See id.* § 635(b)(1)(B).  The LOT Comments explained that LOT was unlikely to purchase widebody Airbus aircraft rather than the Boeing 787s it had ordered because Airbus had no comparable substitute for the 787 available, and because transitioning LOT's current fleet of Boeing 767s to Airbus aircraft would result in substantially greater training time and costs for pilots, crew, and mechanics than transitioning from the Boeing 767 to the 787.  The LOT Comments further explained that LOT was a financially stable airline with a moderate credit rating and thus was able to obtain financing in the private market.

d.       Delta and ALPA's comments in response to the Etihad Notice (Ex. 3) showed that the Bank's guarantee would facilitate the export of advanced Boeing 777 aircraft at below-market rates to Etihad, a major global competitor to U.S. airlines.  The Etihad Comments explained that Etihad had already received more than $1.1 billion in loan guarantees from the Bank since 2010 and had grown rapidly during that same period, and that Etihad competed with U.S. airlines on 96 different international routes accounting for $1.2 billion in annual revenue for U.S. airlines.  Additionally, Delta and

ALPA explained that, if Etihad were to add a daily nonstop route between Los Angeles and its hub in Abu Dhabi, a move the airline has publicly suggested it will make, it would capture roughly 17% of the passengers that currently use U.S. airlines to travel on competing routes (or more than 32,000 passengers), amounting to $18-38 million in U.S. airline revenue each year.

   e. Delta, ALPA, and Hawaiian's comments in response to the Korean Air Notice (Ex. 4) showed that the Bank's guarantee would facilitate the export of advanced Boeing 747 and 777 aircraft at below-market rates to Korean Air, a major competitor to U.S. airlines.  The Comments explained that Korean Air had already received more than $5.1 billion in loan guarantees from the Bank since 1997 and had rapidly expanded its U.S. service during that same period, and that Korean Air competed with U.S. airlines on 314 different international routes accounting for $7.5 billion in annual revenue for U.S. airlines.  The Korean Air Comments noted that Korean Air planned to use Boeing 777 aircraft to increase the frequency of its flights to five U.S. cities in order to obtain greater market share on these routes.  Additionally, the Comments explained that Bank financing would enable Korean Air to add a new U.S. destination, such as Boston, and that if Korean Air were to add a daily nonstop flight between Boston and its hub in Seoul, it would capture 9-14% of the passengers that currently use U.S. airlines to travel on competing routes, amounting to more than 17,000-28,000 passengers and more than $20-33 million in revenue each year.

   f. Delta, ALPA, and Hawaiian's comments in response to the LATAM Notice (Ex. 5) showed that the Bank's guarantee would facilitate the export of advanced Boeing 767 and 777 aircraft at below-market rates to LATAM, a major competitor to

U.S. airlines.  The LATAM Comments explained that LATAM (and its predecessors) had already received more than $4.3 billion in loan guarantees from the Bank since 1997 and had rapidly expanded its U.S. service during that same period, and that LATAM competed with U.S. airlines on 31 different international routes accounting for $2.1 billion in annual revenue for U.S. airlines.  The Comments noted that LATAM had previously used Bank-financed Boeing 777s to increase capacity on routes to the U.S. and had announced that it planned an additional 20-30% capacity increase in 2013.  In particular, the LATAM Comments explained that, if LATAM were to add a daily nonstop route between Boston and its hub in São Paulo, it would capture roughly 36% of the passengers that currently use U.S. airlines to travel on competing routes (or more than 12,000 passengers), amounting to more than $20 million in revenue each year.

55.     Each set of comments provided reasons why the Bank should not apply its categorical "exportable goods screen" from its April 2007 Procedures to refuse to consider the particular harms caused by each of the applications under review.

56.     Each set of comments asked that the Bank apply the April 2013 Procedures to the application before it.

57.     Each set of comments asked "that the Bank's Board of Directors consider [the] comment before reaching a decision on [the] application as required by 12 U.S.C. § 635a(c)(10)(E), and that the Bank respond in writing to [the] comment . . . within 30 days of making a final decision on the Guarantee, as required by § 635a(c)(10)(F)."

58.     Other entities submitted comments in response to the Widebody Notices as well, including Boeing; Honeywell International Inc.; Spirit AeroSystems, Inc.; the National Association of Manufacturers; and the Coalition for Employment through Exports.  All of the

comments submitted in response to the Widebody Notices are available on the regulations.gov

website.

59.     The Bank's Board approved each application for a loan guarantee presented in the

Widebody Notices.[1]

60.     In approving each of the Widebody Applications, Ex-Im Bank failed to consider

or address Plaintiffs' comments.

61.     On or after the date it approved each application, Ex-Im Bank sent an identically

worded letter (Exs. 6-10) in response to Plaintiffs' comments stating:

> Pursuant to Section 3(c)(10)(F) of the Charter of the Export-Import Bank of the
> United States, you have requested a non-confidential summary of the facts found
> and conclusions reached in any detailed analysis or similar study with respect to
> the captioned Transaction.  Ex-Im Bank interprets a "detailed analysis or similar
> study" to refer to a detailed economic impact analysis conducted in accordance
> with Ex-Im Bank's policies and procedures.  Please be advised that, in accordance
> with Ex-Im Bank's policies and procedures in effect when this case was
> authorized, economic impact considerations were deemed inapplicable and no
> detailed economic impact analysis was conducted.

62.     The Bank's categorical disregard of Plaintiffs' specific objections is contrary to

the Bank's statutory obligations (especially as recently amended by Congress) and to the Bank's

own public assurances in the Widebody Notices.

---

[1] *See* Summary of Minutes of Meeting of Board of Directors of October 25, 2012, *available at*
http://www.exim.gov/newsandevents/boardmeetings/board/boardmeeting-
agenda.cfm?pageID=20613 (last visited Mar. 26, 2013) (approving the "Emirates Application");
*id.* (approving the "LOT Application"); Summary of Minutes of Meeting of Board of Directors
of January 17, 2013, *available at*
http://www.exim.gov/newsandevents/boardmeetings/board/boardmeeting-
agenda.cfm?pageID=23616 (last visited Mar. 26, 2013) (approving the "Etihad Application");
Summary of Special Meeting of Bank's Board of Directors of February 19, 2013, *available at*
http://www.exim.gov/newsandevents/boardmeetings/board/boardmeeting-
agenda.cfm?pageID=25183 (last visited Mar. 26, 2013) (approving the "Korean Air
Application"); Agenda of Meeting of Bank's Board of Directors of February 21, 2013, *available
at* http://www.exim.gov/newsandevents/boardmeetings/board/boardmeeting-
agenda.cfm?pageID=25290 (last visited Mar. 26, 2013) (the "LATAM Applications").

63.     Ex-Im Bank's approvals of the Widebody Applications will particularly harm Delta and ALPA Pilots (and, for the Korean Air and LATAM Guarantees, Hawaiian).  In addition to the evidence of harm set forth in each set of comments referenced in paragraph 54, these U.S. airlines compete with Emirates, LOT, Etihad, Korean Air, and LATAM for passengers seeking to fly internationally to and from common U.S. destinations.  Specifically:

   a.     Emirates currently serves seven U.S. cities and competes with Delta (and its joint venture partners) on routes between 219 different city pairs that generate approximately $395 million in annual revenue for Delta (and its joint venture partners). Emirates also competes with U.S. airlines that employ ALPA Pilots on routes between 252 different city pairs that generate annual revenue of approximately $1.7 billion for those carriers.

   b.     LOT currently serves two U.S. cities and competes with Delta (and its joint venture partners) on routes between 86 different city pairs that generate approximately $861 million in annual revenue for Delta (and its joint venture partners). LOT also competes with U.S. airlines that employ ALPA Pilots on routes between 104 different city pairs that generate annual revenue of approximately $2.4 billion for those carriers.

   c.     Etihad currently serves three U.S. cities and competes with Delta (and its joint venture partners) on routes between 81 different city pairs that generate approximately $202 million in annual revenue for Delta (and its joint venture partners). Etihad also competes with U.S. airlines that employ ALPA Pilots on routes between 94 different city pairs that generate annual revenue of approximately $1 billion for those carriers.

     d.     LATAM currently serves five U.S. cities and competes with Delta (and its joint venture partners) on routes between 51 different city pairs that generate approximately $209 million in annual revenue for Delta (and its joint venture partners). LATAM also competes with U.S. airlines that employ ALPA Pilots on routes between 51 different city pairs that generate annual revenue of approximately $500 million for those carriers.

     e.     Korean Air currently serves 11 U.S. cities (including Guam) and competes with Delta (and its joint venture partners) on routes between 234 different city pairs that generate approximately $3.1 billion in annual revenue for Delta (and its joint venture partners). Korean Air competes with Hawaiian on routes between 38 different city pairs that account for approximately $308 million in annual revenue for Hawaiian. Korean Air also competes with U.S. airlines that employ ALPA Pilots on routes between 330 different city pairs that generate annual revenue of approximately $6.7 billion for those carriers.

64.     Although the ruling is pending appeal, Plaintiffs acknowledge that the district court in the *ATA* case ruled that the Bank's April 2007 screening procedures were consistent with the Bank Act *before* the amendments in the Reauthorization Act. However, neither the Reauthorization Act nor the Bank's April 2013 Procedures were at issue in that case. The court accordingly did not consider whether the April 2007 screening procedures were consistent with the amendments to the Bank's statutory charter, nor did it consider whether the current procedures could be reconciled with the Bank's acknowledgment in the April 2013 Procedures that aircraft transactions can and do have cognizable adverse economic effects on U.S. airlines.

## COUNT I
### Approval of Applications for Loan Guarantees in Violation of 5 U.S.C. § 706(2)(C)

65.    All preceding paragraphs are repeated, realleged, and incorporated.

66.    The Bank's approval of the Widebody Applications, specifically, application numbers AP087328XX and AP087328XA to Emirates Airlines; AP087110XX to LOT Polish Airlines; AP087613XX to Etihad Airways; AP087730XX and AP087730XA to LATAM Airlines Group, S.A.; and AP087595XX, AP087595XB, and AP087595XA to Korean Air Lines constitutes final agency action that adversely impacts Plaintiffs.

67.    The Bank's approval of each Widebody Application exceeds Defendants' statutory authority under the Bank Act, the Reauthorization Act, and the APA.

68.    The Court should vacate and set aside the Bank's approval of each Widebody Application under 5 U.S.C. § 706(2)(C).

## COUNT II
### Approval of Applications for Loan Guarantees in Violation of 5 U.S.C. § 706(2)(D)

69.    All preceding paragraphs are repeated, realleged, and incorporated.

70.    The Bank's approval of each of the Widebody Applications constitutes final agency action that adversely impacts Plaintiffs.

71.    Defendants approved each of the Widebody Applications in violation of the procedural requirements of the Bank Act, the Reauthorization Act, and the APA.

72.    The Court should vacate and set aside the Bank's approval of each Widebody Application under 5 U.S.C. § 706(2)(D).

## COUNT III
### Approval of Applications for Loan Guarantees in Violation of 5 U.S.C. § 706(2)(A)

73.    All preceding paragraphs are repeated, realleged, and incorporated.

74.     The Bank's approval of each Widebody Application constitutes final agency action that adversely impacts Plaintiffs.

75.     The Bank's actions in approving each Widebody Application were arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law.

76.     The Court should vacate and set aside each Widebody Application under 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Delta, Hawaiian, and ALPA request as relief an order of this Court:

A.     Declaring that Defendants violated the APA by approving the Widebody Applications;

B.     Declaring any action previously taken by the Bank or any Defendant pursuant to the Bank's approvals of the Widebody Applications null and void, and setting any such action aside;

C.     Vacating the Bank's approvals of the Widebody Applications;

D.     Enjoining Defendants and their officers, employees, and agents from implementing, applying, or taking any action whatsoever pursuant to the Bank's approvals of the Widebody Applications;

E.     Awarding Plaintiffs their reasonable costs, fees, and attorneys' fees incurred in bringing this action; and

F.     Granting such other legal and equitable relief as the Court deems just and proper.

Date:  April 3, 2013

Respectfully submitted,

/s/ Jonathan B. Hill (by authorization)
Jonathan B. Hill (Bar No. 141473)
DOW LOHNES P.L.L.C.
1200 New Hampshire Avenue, N.W.
Suite 800
Washington, D.C. 20036-6802
(202) 776-2725
jhill@dowlohnes.com

*Attorney for Plaintiff Hawaiian Airlines, Inc.*

/s/ R. Russell Bailey (by authorization)
Jonathan A. Cohen (Bar No. 952861)
R. Russell Bailey (Bar No. 339093)
David M. Semanchik (Bar No. 502837)
AIR LINE PILOTS ASSOCIATION, INTERNATIONAL
1625 Massachusetts Avenue, N.W., 8th Floor
Washington, D.C. 20036
(202) 797-4086
Jonathan.Cohen@alpa.org
Russell.Bailey@alpa.org
David.Semanchik@alpa.org

*Attorneys for Plaintiff Air Line Pilots
Association, International*

/s/ Michael K. Kellogg
Michael K. Kellogg (Bar No. 372049)
Wan J. Kim (Bar No. 454269)
Gregory G. Rapawy (Bar No. 493973)
W. Joss Nichols (Bar No. 1001126)
KELLOGG, HUBER, HANSEN, TODD,
  EVANS & FIGEL, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
mkellogg@khhte.com
wkim@khhte.com
grapawy@khhte.com
jnichols@khhte.com

*Attorneys for Plaintiff Delta Air Lines, Inc.*