**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DELTA AIR LINES, INC., *et al.*,                  :
                                                  :
        Plaintiffs,                               :        Civil Action No.:        13-0424 (RC)
                                                  :
        v.                                        :        Re Document Nos.:        19, 30, 31, 32
                                                  :
EXPORT-IMPORT BANK OF THE,                        :
UNITED STATES, *et al.*,                          :
                                                  :
        Defendants.                               :

**<u>MEMORANDUM OPINION</u>**

**Granting Defendants' Motion for Summary Judgment; Denying Plaintiffs'
Motion for Summary Judgment; Denying Plaintiffs' Motion to Supplement the
Administrative Record as Moot; and Denying Plaintiffs' Motion for Discovery**

**I. INTRODUCTION**

The Export-Import Bank ("Ex-Im Bank" or "Bank") is an independent agency

established in 1934 as the official export credit agency ("ECA") of the United States to promote

and facilitate U.S. exports by providing loans and loan guarantees to foreign purchasers of U.S.-

manufactured goods and services.  The U.S. aircraft manufacturing industry is one of many

domestic industries that rely on Ex-Im Bank support to compete with foreign manufacturers that

receive similar support from foreign ECAs.  But while U.S. aircraft manufacturers enjoy the

benefits of the Ex-Im Bank's assistance in selling their planes to foreign airline purchasers, U.S.

commercial airlines, which are not eligible for financing from the Bank, object to the boost that

the Bank's support provides to overseas competitors.

Delta Air Lines, Inc. ("Delta"), Hawaiian Airlines, Inc. ("Hawaiian"), and the Air Line

Pilots Association, International ("ALPA") (collectively, "Plaintiffs") are among those that

protest the Ex-Im Bank's support of foreign aircraft purchasers.  Together, Plaintiffs have

embarked on a multipronged litigation attack against the Ex-Im Bank and its Board of Directors

(collectively, "Defendants"), in which they maintain, among other things, that the Bank has

violated the Export-Import Bank Act of 1945 ("Bank Act" or "Charter") and the Administrative

Procedure Act ("APA") through the adoption and application of certain internal economic impact

procedures ("EIPs"), which the Bank uses to assess the economic effects of potential transactions

within its broader process of determining whether to approve an application for Bank financing.

      Specifically at issue in this action — one of three separate lawsuits brought by Plaintiffs

currently pending before this Court — is the Ex-Im Bank's approval of five aircraft financing

transactions between October 2012 and February 2013.  The loan guarantees for these

transactions initially were approved by the Bank under its 2007 EIPs, but Defendants later

sought a voluntary remand in this case in order to evaluate the financing commitments under the

Bank's newly adopted 2013 EIPs and Guidelines.  In the end, the Bank reached the same

conclusion on remand under the updated 2013 procedures as it did under the 2007 EIPs: in the

Bank's view, none of the financing commitments were likely to cause serious adverse economic

effects to U.S. industry and employment, and as such, the Bank was correct to issue the loan

guarantees.

      Plaintiffs now assert that the Bank's adoption and application of the 2007 EIPs and the

2013 EIPs and Guidelines was in excess of its statutory authority under the Bank Act, without

observance of procedures required by law, and arbitrary and capricious.  Defendants, on the

other hand, assert that the Bank acted reasonably and within the modest contours of the Bank Act

in regard to both the 2007 EIPs and the 2013 EIPs and Guidelines.  Defendants and Plaintiffs

each have filed a motion for summary judgment.  Upon consideration of the parties' motions and

the memoranda in support thereof and opposition thereto, the Court will grant Defendants'

motion for summary judgment and deny Plaintiffs' motion.

## II.  BACKGROUND

### A.  Statutory Framework: The Ex-Im Bank And The Bank Act

The Ex-Im Bank is an independent federal agency and corporation that has its origins in a

1934 Executive Order issued by then-President Franklin Roosevelt.  *See* Exec. Order No. 6581

(Feb. 2, 1934).  The Bank assumed its current form with the passage of the Bank Act, ch. 341, 59

Stat. 526, which, as amended and codified at 12 U.S.C. § 635 *et seq.*, remains the Bank's

governing Charter.  The Bank Act declares that "[t]he Bank's objective in authorizing loans,

guarantees, insurance, and credits shall be to contribute to maintaining or increasing employment

of United States workers."  12 U.S.C. § 635(a)(1).  "In connection with and in furtherance of its

objects and purposes, the Bank is authorized and empowered to do a general banking business,"

including "to guarantee, insure, coinsure, and reinsure against political and credit risks of loss."

*Id*.  Loans and loan guarantees issued by the Ex-Im Bank carry the full faith and credit of the

United States government, *id*. § 635k, and Congress has reauthorized the Bank on more than

twenty occasions since 1947.[1]

The Bank Act identifies many policy concerns for the Bank to take into consideration

when deciding whether to approve an application for financing support.[2]  In particular, the

---

[1]     At the time this lawsuit was filed, the Bank Act was slated to expire on September 30, 2014, but Congress has since extended the Act through June 30, 2015.  *See* Pub. L. No. 113-164, § 147, 128 Stat. 1867 (2014).  Thus, as part of that next reauthorization process, Congress will have another opportunity to clearly communicate to all interested parties what role it wants the Bank to play in financing aircraft transactions.

[2]     *See, e.g.*, 12 U.S.C. § 635(b)(1)(B), (D), (E), (H), (K) (declaring that the Bank should "supplement and encourage, and not compete with, private capital"; provide loans that are "for specific purposes, and, in the judgment of the Board of Directors, offer reasonable assurance

statute requires the Bank to "give particular emphasis to the objective of strengthening the competitive position of United States exporters and thereby of expanding total United States exports." *Id*. § 635(b)(1)(B)(ii).  The statute also declares that it is "the policy of the United States that loans made by the Bank in all its programs shall bear interest … at rates and on terms and conditions which are fully competitive with exports of other countries, and consistent with international agreements." *Id*. § 635(b)(1)(B).  In addition, the Bank must work with other ECAs to "minimize competition in government-supported export financing." *Id*. § 635(b)(1)(A).

In requiring the Ex-Im Bank to be competitive, Congress has emphasized that the Bank must process financing applications efficiently and with flexibility, so as not to cause a U.S. exporter to lose an export opportunity.  *See id*. § 635(b)(1)(B) (the Bank's loans should "neutralize the effect of … foreign credit on international sales competition"); *see also* S. Rep. No. 99-274, at 8 (1986) (recognizing "the need for [the Bank] to respond to exporters' requests for support in a timely … fashion"); *id*. (noting that the adverse economic impact provision of the Bank Act "should be implemented in a way that does not reduce the Bank's competitiveness and flexibility in assisting U.S. exporters nor ignore the positive aspects of the export sale").

The Bank Act also contains several provisions requiring the Bank and its Board of Directors ("Board") to take into account potential serious adverse effects on U.S. industry and employment when considering a proposed transaction.  Thus, beginning in 1968, Congress has declared that it is the "policy of the United States" that

> in authorizing any loan or guarantee, the Board of Directors shall take into
> account any serious adverse effect of such loan or guarantee on the competitive

---

of repayment"; "foster the delivery of United States services in international commerce"; "encourage the participation of small business in international commerce"; "foster the development of democratic institutions and market economies in countries seeking such development, and … assist the export of high technology items to such countries"; and "promote the export of goods and services related to renewable energy sources").

> position of United States industry, the availability of materials which are in short
> supply in the United States, and employment in the United States, and shall give
> particular emphasis to the objective of strengthening the competitive position of
> United States exporters and thereby of expanding total United States exports.

12 U.S.C. § 635(b)(1)(B)(ii); *see* Pub. L. No. 90-267, § 1(b), 82 Stat. 47, 47 (1968).  In 1978,

Congress amended the Bank Act to include the provision now codified at 12 U.S.C. § 635a-2,

which calls on the Bank to

> implement such regulations and procedures as may be appropriate to insure that
> full consideration is given to the extent to which any loan or financial guarantee is
> likely to have an adverse effect on industries, including agriculture, and
> employment in the United States, either by reducing demand for goods produced
> in the United States or by increasing imports to the United States.

*Id.*; *see* Pub. L. No. 95-630, § 1911, 92 Stat. 3641, 3726 (1978).  This provision later was

amended to require the Bank to "address in writing the views of [those] who may be

substantially adversely affected by the loan or guarantee," Pub. L. No. 99-472, § 12, 100 Stat.

1200 (1986), but Congress also specifically provided that "[t]his requirement does not subject the

Bank to the provisions of subchapter II of chapter 5 of title 5," *id.*, which is the administrative

procedure portion of the APA.  *See* 5 U.S.C. §§ 551-59.

    In 1986, Congress incorporated § 608 of the Foreign Operations Appropriations Act of

1978, Pub. L. No. 95-481, § 608, 92 Stat. 1591 (1978), into the Bank Act under substantially

similar terms.  *See* Pub. L. No. 99-472, § 11, 100 Stat. 1200, 1203-04 (1986).  The Bank Act thus

provides, among other things, that the Bank may not extend a financial guarantee for the

"production of any commodity for export by any country other than the United States" if the

Board determines that "(i) the commodity is likely to be in surplus on world markets at the time

the resulting commodity will first be sold; or (ii) the resulting production capacity is expected to

compete with United States production of the same, similar, or competing commodity."  12

U.S.C. § 635(e)(1).  Such a limitation does not apply, however, when the Board determines that

the "short- and long-term benefits to industry and employment in the United States are likely to outweigh the short- and long-term injury to United States producers and employment of the same, similar, or competing commodity." *Id*. § 635(e)(3). Congress has specified that "substantial injury" occurs when "the amount of the capacity for production established, or the amount of the increase in such capacity expanded, by" a transaction "equals or exceeds 1 percent of United States production." *Id*. § 635(e)(4).

Section 635(e), moreover, provides that "[i]f … the Bank conducts a detailed economic impact analysis or similar study," it must provide notice and obtain comments on the potential economic effects of the financing support. *Id*. § 635(e)(7)(B)(i). Under this provision, the Bank also must consider certain factors when conducting a detailed economic analysis. *See id*. § 635(e)(7)(A). In addition, Congress requires the Bank to implement such regulations and procedures as may be appropriate, *see id*. § 635(e)(7)(G), and as it did in § 635a-2, Congress provided that "[t]his paragraph shall not be construed to make [the administrative procedure portion of the APA, 5 U.S.C. §§ 551-59,] applicable to the Bank." *Id*. § 635(e)(7)(F).

In May 2012, when it reauthorized the Bank, Congress imposed two new requirements regarding the Bank's assessment of potential adverse economic impacts. First, Congress required the Bank to, within 180 days, "develop and make publicly available methodological guidelines to be used by the Bank in conducting economic impact analyses or similar studies" of any potential adverse effects its transactions might have on U.S. industry and employment. Reauthorization Act § 12(a). Second, Congress specified that "[i]n developing the guidelines, the Bank shall take into consideration any relevant guidance from the Office of Management and Budget." *Id*.

### B.   The 2007 EIPs And The Exportable Goods Screen

In an attempt to comply with its statutory mandate to "take into account" the adverse impact of its loans and loan guarantees on U.S. industry and employment, the Bank has adopted EIPs that, among other things, use screens to exempt certain transactions from in-depth economic impact analysis.  *See* Administrative Record ("AR") at 1368-73.  Of relevance here, in 2001 the Bank changed its EIPs to include a new screen that excluded from in-depth review any "transaction[] that would result in the provision of exportable services from foreign countries" (the "exportable goods screen").  *See id.* at 1371.  By extension, this screen excluded from economic impact analysis the Bank's financing of foreign aircraft transactions, which the Bank deems to result in the production of exportable services (*i.e.*, airline seats), not exportable goods.  *See id.* at 1371-72.  The Bank revised its EIPs in 2007 but retained the exportable goods screen.  *See id.* at 1356-64 (2007 EIPs).  Thus, from 2001 to 2013, when the Bank again revised its EIPs and adopted the 2013 EIPs and Guidelines, *see id.* at 1441-55 (2013 EIPs and Guidelines), the Bank did not conduct in-depth economic analysis regarding the impact of its aircraft financing transactions.

### C.   *ATA*, *Delta I*, And The Bank's Remand Responses

In 2011, the Air Transport Association of America, ALPA, and Delta challenged the Bank's loan guarantee commitments to Air India for the purchase of certain Boeing aircraft, which the Bank reviewed under its 2007 EIPs.  *See Air Transp. Ass'n of Am. v. Export-Import Bank* ("*ATA*"), 878 F. Supp. 2d 42 (D.D.C. 2012).  After the parties filed dispositive motions in that case, Judge Boasberg granted summary judgment in favor of Defendants, concluding that the "Bank acted neither arbitrarily and capriciously nor contrary to its governing statute when it approved the" Air India transactions using the exportable goods screen.  *Id*. at 54.  Delta and

ALPA (but not the Air Transport Association of America) appealed, and the D.C. Circuit reversed.

In particular, the D.C. Circuit did not determine that the exportable goods screen was inconsistent with the Bank Act. *See Delta Air Lines, Inc. v. Export-Import Bank* ("*Delta I*"), 718 F.3d 974, 975 (D.C. Cir. 2013) (per curiam). Instead, the circuit court simply held that the Bank "[had] not reasonably explained its justification for the categorical conclusion at issue." *Id*. Accordingly, the D.C. Circuit directed the district court "to remand the case to the Bank for further proceedings," without vacating the Air India commitments, and the circuit court provided the Bank with three options on remand:

> (i) attempt to provide a reasonable explanation for how the [2007 EIPs], which screen out loans and loan guarantees to service providers, square with the statute's requirements, or (ii) adequately consider and explain any adverse effects that these particular Air India loan guarantees have on U.S. industries and U.S. jobs, or (iii) take whatever other action the Bank deems appropriate to comply with the Bank Act and the APA.

*Id*.

The Bank responded to the *Delta I* remand order by preparing and publishing two documents, entitled Response One and Response Two (collectively, the "Remand Responses").[3] *See* AR at 1365-98 (Response One), 1399-440 (Response Two). Response One was the Bank's "attempt to provide a reasonable explanation for how the [2007 EIPs] … square with the [Bank Act's] requirements." *Id.* at 1365. Alternatively, Response Two attempted to "consider and explain any adverse effects that these particular Air India loan guarantees have on U.S. industries and U.S. jobs," *id.* at 1399, and it concluded that "the benefits of the Bank's guarantees in the

---

[3]    *See* Response One, *available at* http://www.exim.gov/about/library/reports/ otherreports/upload/Option-1-Memo-OGC-11-22-13cd-accessible-v2.pdf; Response Two, *available at* http://www.exim.gov/about/library/reports/otherreports/upload/Option_2_Memo-OGC-11-22-13-accessible.pdf.

Air India transactions significantly outweigh any potential adverse effects of such guarantees, if, indeed, there are any adverse effects."[4]  *Id.* at 1404.

### D.  Adoption Of The 2013 EIPs And Guidelines

Though Congress did not require the Bank to modify the 2007 EIPs, or the way in which the Bank applied them, when it reauthorized the Bank in May 2012, the Bank undertook to revise its EIPs anyways, as it has done from time-to-time throughout its existence.  As the Bank's policy group informed the Board, the Bank already had been reassessing the EIPs after becoming aware of several concerns regarding the transparency of the methodology used in connection with detailed economic impact analyses, the relevance of the assumptions applied to the methodology, and the application of economic impact analysis to services, including aircraft financing transactions.  *See id.* at 1995.  The Reauthorization Act therefore "provided the opportunity [for] the Bank to conclude its reassessment" of the EIPs.  *Id.*

On September 27, 2012, while *Delta I* was pending, the Bank proposed new "Economic Impact Procedures and Methodological Guidelines" to govern its review of proposed transactions, and the Bank made the proposal available on its website and in the Federal Register.[5]  *See id.* at 1456, 1670.  On November 19, 2012, the Bank's Board adopted the new EIPs, as well as an explanation of the guidelines for conducting detailed economic impact

---

[4]        Plaintiffs have filed a separate lawsuit, *Delta IV*, challenging the sufficiency of Response One and Response Two in the context of the Air India commitments, and there is substantial overlap between the arguments made by both parties here, in *Delta III*, and in the summary judgment briefing in *Delta IV*.  *See Delta Air Lines, Inc. v. Export-Import Bank*, No. 14-cv-0042-RC (D.D.C. filed Jan. 10, 2014) ("*Delta IV*").

[5]        *See* Export-Import Bank, Economic Impact Policy, 77 Fed. Reg. 59,397 (Sept. 27, 2012); Proposal, Export-Import Bank of the United States, Economic Impact Procedures and Methodological Guidelines (Sept. 27, 2012), *available at* http://www.exim.gov/General bankpolicies/economicimpact/upload/9-27-2012-Proposal-Economic-Impact-Proceduresand-Methodological-Guidelines.pdf.

analyses, and set the effective date as April 1, 2013, to allow time for implementation, including time to commission an independent expert to conduct the structural oversupply analysis called for by the new procedures. *See id.* at 1441, 2016. The so-called "2013 EIPs and Guidelines" remain in effect today.

The 2013 EIPs and Guidelines take a different approach than the 2007 EIPs in assessing certain potential transactions. Specifically, under the new guidelines, proposed transactions that will result in an increase in services are no longer categorically screened from further economic impact analysis, as they were under the 2007 EIPs and the exportable goods screen. *See id.* at 1442. Instead, the Bank decided to subject to further review those transactions involving service sectors for which interested parties have identified specific cases of potential impact and have provided quantified estimates of potential harm. *See id.* at 1442 n.7. The Bank then determined that, at the time of passing the new EIPs, "the only transactions creating an exportable service deemed to meet [these] criteria [are] aircraft" transactions. *See id.* The 2013 EIPs and Guidelines therefore set forth a step-by-step methodology for the Bank's review of aircraft financing transactions (the "aircraft-specific procedures"), which is divided into four stages, with the first two stages constituting "screens" designed to identify those aircraft transactions that merit detailed economic impact analyses, and the latter two stages summarizing the methodology for conducting such detailed analyses, when required. *See id.* at 1453-55.

### E.  The Five Transactions And The Present Litigation: *Delta III*

On April 3, 2013, Plaintiffs filed the present lawsuit, *Delta III*, challenging the Bank's decision to approve the following five aircraft financing transactions (the "Five Transactions") under the 2007 EIPs between October 2012 and February 2013:

1. The Emirates Transaction: Applications from the International Lease Finance Corporation to support financing totaling $304,553,725 for the purchase of Boeing

777 aircraft to be leased to Emirates, approved on October 25, 2012.  *See id.* at 3 (Federal Register Notice, 77 Fed. Reg. 58,139 (Sept. 19, 2012)); *id.* at 162-242 (memos to the Board).

2.  The LOT Transaction: Application from LOT Polish Airlines to support financing totaling $486,464,580 for the purchase of Boeing 787 aircraft, approved on October 25, 2012.  *See id.* at 252 (Federal Register Notice, 77 Fed. Reg. 58,139 (Sept. 19, 2012)); *id.* at 451-533 (memos to the Board).

3.  The Etihad Transaction: Application from Etihad Airways to support financing totaling $314,376,672 for the purchase of Boeing 777 aircraft, approved on January 17, 2013.  *See id.* at 543 (Federal Register Notice, 77 Fed. Reg. 74,010 (Dec. 12, 2012)); *id.* at 699-778 (memos to the Board).

4.  The KAL Transaction: Applications from Korean Air Lines to support financing totaling $480,362,851 for the purchase of Boeing 777 and 747 aircraft, approved on February 19, 2013.  *See id.* at 788 (Federal Register Notice, 78 Fed. Reg. 2,672 (Jan. 14, 2013)); *id.* at 955-1068 (memos to the Board).

5.  The LATAM Transaction: Applications from LATAM Airlines Group, consisting of LAN Airlines (Chile) and TAM Airlines (Brazil), to support financing totaling $593,848,242 for the purchase of Boeing 777 and 767 aircraft, approved on February 21, 2013.  *See id.* at 1077 (Federal Register Notice, 78 Fed. Reg. 2,673 (Jan. 14, 2013)); *id.* at 1221-1311 (memos to the Board).

Delta and ALPA submitted written comments opposing each of the proposed loan guarantees, and Hawaiian participated in the comments on the KAL and LATAM transactions.  *See id.* at 5-149, 254-438, 547-692, 797-946, 1087-213.  For each transaction, the Bank's staff prepared a memorandum and presentation for the Board; among other things, the staff memorandum briefly summarized the public comments that the Bank received regarding each transaction.  *See id.* at 239-42, 527-33, 776-78, 1057-61, 1307-11.  And because the Bank applied the 2007 EIPs and the exportable goods screen, each memorandum stated that no detailed economic impact analysis was required for the final commitments at issue.  *See id.* at 176, 463, 707, 985, 1248.

Returning to the present litigation, Plaintiffs originally challenged the Bank's authorization of the Five Transactions under the 2007 EIPs as contrary to the APA and the Bank Act.  The parties also recognized, however, that the D.C. Circuit's then-anticipated ruling on

appeal from *ATA* was "likely to inform the question[s]" before this Court, including "whether the Bank was obligated to conduct detailed economic assessments of the potential harms caused by its financing before approving each of the foreign airline applications challenged in th[e] Complaint." Joint Mot. Stay, ECF No. 11, at 2.  Accordingly, the parties asked the Court to stay this litigation until *Delta I* was decided, which the Court did.  *See* Minute Order (May 17, 2013).

On June 18, 2013, the D.C. Circuit issued its decision in *Delta I*, reversing *ATA* and ordering the district court to remand the matter to the Bank.  In light of the D.C. Circuit's decision, Defendants requested a voluntary remand regarding the financing commitments at issue in this case.  *See* Joint Proposed Sched., ECF No. 17.  On remand, the Bank analyzed the Five Transactions under the 2013 EIPs and Guidelines (the "Remand Analyses"), *see* AR at 1323-55, and according to the cover memorandum for the Remand Analyses, the Bank concluded that "[i]n all cases … the transactions do not meet the standards for adverse economic impact."[6]  *Id.* at 1323.  In particular, the Remand Analyses applied the 2013 EIPs and Guidelines either to screen out each transaction from detailed analysis at Stage II or to conclude at Stages III and IV that there was no significant risk of adverse economic effects to the U.S. airline industry.[7]  *See id.* at 1325-51.  Plaintiffs now object to the Remand Analyses and the Remand Responses, and as

---

[6]      Because the transaction with LATAM involved two separate airlines that "operate independently of one another," LAN (Chile) and TAM (Brazil), the Bank actually conducted six analyses on remand, even though only five transactions are at issue here.  *See* AR at 1323 n.1. The transaction as approved by the Bank technically involved "LATAM," a holding company that resulted from the merger between LAN and TAM.  For purposes of its remand analysis, however, the Bank analyzed the two airlines separately since they operate independently.  *See id.* at 1323.  Later, the portion of the LATAM transaction involving TAM was cancelled, while the portion involving LAN was not cancelled.  *See id.* at 1334.

[7]      In addition to *Delta IV* and the present suit, *Delta III*, Plaintiffs have a third suit pending against the Bank.  In *Delta Air Lines, Inc. v. Export-Import Bank*, No. 13-cv-0192-RC (D.D.C. filed Feb. 13, 2013) ("*Delta II*"), Plaintiffs assert a facial challenge to the 2013 EIPs and Guidelines, arguing that these EIPs violate the APA and the Bank Act even before they were applied to a financing transaction.

a remedy, Plaintiffs request that the Court vacate the loan guarantees issued by the Bank in conjunction with the Five Transactions.  Plaintiffs and Defendants each have filed a motion for summary judgment.

### III.  LEGAL STANDARD

Summary judgment may be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the substantive outcome of the litigation.  *See Liberty Lobby*, 477 U.S. at 248; *Holcomb*, 433 F.3d at 895.  A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007); *Liberty Lobby*, 477 U.S. at 248; *Holcomb*, 433 F.3d at 895.

Though styled as motions for summary judgment, the dispositive pleadings in this case actually seek the Court's review of administrative action.  The standard set forth in Rule 56(c) therefore does not apply because of the limited role of a court in reviewing the administrative record.  *See Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 89-90 (D.D.C. 2006) (citing *Nat'l Wilderness Inst. v. U.S. Army Corps of Eng'rs*, No. CIV 01-0273, 2005 WL 691775, at *7 (D.D.C. Mar. 23, 2005)); *Fund for Animals v. Babbitt*, 903 F. Supp. 96, 105 (D.D.C. 1995), *amended on other grounds*, 967 F. Supp. 6 (D.D.C. 1997).  "[T]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."  *Sierra Club*, 459 F. Supp. 2d at 90 (citation and quotation omitted).  Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise

consistent with the APA standard of review.  *See Richards v. INS*, 554 F.2d 1173, 1177 (D.C. Cir. 1977); *Bloch v. Powell*, 227 F. Supp. 2d 25, 31 (D.D.C. 2002).

The APA "sets forth the full extent of judicial authority to review executive agency action for procedural correctness."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009).  It requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  This is a "narrow" standard of review as courts defer to the agency's expertise.  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  An agency is required to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Id.* (internal citation and quotation omitted).  The reviewing court "is not to substitute its judgment for that of the agency," *id.*, and thus "may not supply a reasoned basis for the agency's action that the agency itself has not given."  *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974).  Nevertheless, a decision that is not fully explained may be upheld "if the agency's path may reasonably be discerned."  *Id.* at 286; *see also Dillmon v. Nat'l Transp. Safety Bd.*, 588 F.3d 1085, 1089 (D.C. Cir. 2009) (a court must "defer to the wisdom of the agency, provided its decision is reasoned and rational").

Finally, a court's review is particularly deferential when a plaintiff challenges agency decisions that balance competing statutory mandates and involve technical, predictive judgments within the agency's special area of expertise.  *See Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 377 (1989) (when the agency's analysis "requires a high level of technical expertise," courts "must defer to the informed discretion of the responsible federal agencies" (citation and quotation marks omitted)); *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009)

("The 'arbitrary and capricious' standard is particularly deferential in matters implicating predictive judgments[.]" (citations omitted)).  "Thus, when an agency's decision is primarily predictive, [a court's] role is limited; [courts] require only that the agency acknowledge factual uncertainties and identify the considerations it found persuasive." *Rural Cellular*, 588 F.3d at 1105.

## IV.  ANALYSIS

Through this lawsuit, Plaintiffs allege that the Bank's *Delta I* Remand Responses and *Delta III* Remand Analyses should be excluded from the administrative record as *post-hoc* rationalizations, but even if considered part of the record, these remand papers should be rejected because the 2007 EIPs and the 2013 EIPs and Guidelines, as designed and adopted by the Bank, violate the APA, the Bank Act, and the Reauthorization Act for both procedural and substantive reasons.  Alternatively, Plaintiffs argue that even if the 2013 EIPs and Guidelines are not facially invalid, the application of those EIPs to the Five Transactions on remand was arbitrary and capricious and in violation of the Bank Act.

In addition to opposing each of Plaintiffs' arguments for summary judgment, Defendants move for summary judgment on their own behalf.  First, Defendants argue that they correctly evaluated the Five Transactions under the 2007 EIPs initially because those were the procedures in effect at the time of the relevant financing decisions, not the 2013 EIPs and Guidelines.  Second, Defendants argue that the Court should uphold the exportable goods screen in the 2007 EIPs based on the explanation the Bank provided in Response One following the *Delta I* remand.  And third, Defendants argue that the Remand Analyses applying the 2013 EIPs and Guidelines to the Five Transactions further demonstrate the reasonableness of the Bank's actions in approving the contested financing commitments.

Resolving the parties' motions for summary judgment requires the Court to address numerous textbook questions of administrative law and to grapple with complex economic and financial concepts as they relate to the airline industry.  To do so, the Court will proceed as follows.  First, the Court addresses whether it may consider Response One as part of the administrative record, or whether this remand response must be excluded as a *post-hoc* rationalization.  Second, after concluding that Response One is properly before the Court, the Court considers the sufficiency of the Bank's justification for the exportable goods screen.  And third, the Court addresses Plaintiffs' argument that the Bank erred by applying the 2007 EIPs, rather than the 2013 EIPs and Guidelines, when originally authorizing the Five Transactions.

Because the Court concludes that it may consider Response One, that the 2007 EIPs represent a reasonable interpretation of the relevant statutes, and that the Bank acted reasonably when it applied the 2007 EIPs to approve the Five Transactions, the Court finds that Defendants have done enough to overcome Plaintiffs' challenge to the Bank's authorizations for the Five Transactions.  Accordingly, the Court grants summary judgment for Defendants as to Plaintiffs' Counts I, II, and III.  In so doing, the Court also finds that it is both unnecessary and imprudent to address the Remand Analyses and the 2013 EIPs and Guidelines in this litigation because the Court upholds the financing authorizations regardless of the agency's decisionmaking in adopting the new EIPs and during the voluntary remand, and any alternative analysis considering such issues here would amount to little more than the Court delivering an advisory opinion to the agency about its actions, which is forbidden.

### A.  Whether Response One Is Properly Before The Court

A threshold issue that will dictate the rest of the Court's analysis herein is whether Response One is reviewable as part of the administrative record.[8]  Specifically, in *Delta I*, the D.C. Circuit held that the Bank's decision to approve the Air India transactions could not be sustained because, "at a minimum," the Bank had not "reasonably explained its justification" for the exportable goods screen.  *Delta I*, 718 F.3d at 978.  The circuit court therefore directed the Bank on remand to explain how its exportable goods screen "square[s] with the [Bank Act's] requirements," *id.*, and the Bank prepared Response One in an attempt to do just that.  Plaintiffs now object to the Court considering Response One as part of the administrative record on the basis that the Bank's actions constituted a forbidden *post-hoc* rationalization.  *See* Pls.' Mem. Supp. Mot. Summ. J., ECF No. 31-1, at 24-25.

Without doubt, a "fundamental rule of administrative law" is that a court reviewing an agency's decision "must judge the propriety of [the agency] action solely by the grounds invoked by the agency."  *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).  Typically, the grounds reviewed will appear in the administrative record, *see Cmty. for Creative Non-Violence v. Lujan*, 908 F.2d 992, 997 (D.C. Cir. 1990), and judicial review therefore "is to be based on the full administrative record that was before the [agency] at the time [it] made [its] decision."  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971).  Accordingly, "it is the agency's responsibility, not this Court's, to explain its decision," *State Farm*, 463 U.S. at 57, and

---

[8]        Response Two, which attempted to explain why the Air India transactions did not result in substantial adverse effects on the U.S. economy, is not relevant to Plaintiffs' lawsuit targeting the Five Transactions because this response did not address the merits of the 2007 EIPs or the exportable goods screen.  The Court therefore does not consider whether Response Two was a *post-hoc* rationalization.  In addition, because the Court need not reach the merits of the 2013 EIPs and Guidelines, the Court also does not consider today whether the Remand Analyses constituted *post-hoc* rationalizations.

if the agency's "grounds are inadequate or improper, the [C]ourt is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis." *Chenery*, 332 U.S. at 196. It is unsurprising, then, that *post-hoc* rationalizations "have traditionally been found to be an inadequate basis for review" of agency decisions. *Overton Park*, 401 U.S. at 419; *see also Edison Elec. Inst. v. OSHA*, 849 F.2d 611, 617-18 (D.C Cir. 1988) ("Ordinarily,… neither party is entitled to supplement the record with litigation affidavits or other evidentiary material that was not before the agency." (citations omitted)).

At the same time, however, the D.C. Circuit explained in *Alpharma, Inc. v. Leavitt*, 460 F.3d 1 (D.C. Cir. 2006), that *Overton Park* also "approved the procedure of remanding so that an agency can provide an explanation for an inadequately articulated decision." *Id.* at 6. The prohibition against *post-hoc* rationalizations therefore "is not a time barrier which freezes an agency's exercise of its judgment after an initial decision has been made and bars it from further articulation of its reasoning." *Id.* (citation and quotation omitted); *see also Amoco Oil Co. v. EPA*, 501 F.2d 722, 729 n.10 (D.C. Cir. 1974) ("Rule-making is necessarily forward-looking, and by the time judicial review is secured events may have progressed sufficiently to indicate the truth or falsity of agency predictions. We do not think a court need blind itself to such events[.]"). Further, the Supreme Court has explained that if the administrative "record before the agency does not support the agency action … or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for *additional investigation or explanation*." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) (emphasis added). The Court finds that, through Response One, the Bank offers the exact type of "amplified

articulation" and "additional explanation" regarding the basis for the exportable goods screen that the D.C. Circuit demanded in *Delta I*.

Plaintiffs' primary complaint about Response One is that it was not ratified through a vote by the Bank's Board. *See, e.g.*, Pls.' Mem. Supp. Mot. Summ. J., ECF No. 31-1, at 25. For this proposition, Plaintiffs rely on the D.C. Circuit's decision in *Alpharma*, which held that the rule against *post-hoc* rationalizations "'forbids judges to uphold agency action on the basis of rationales offered by anyone other than the proper decisionmakers.'"  460 F.3d at 6 (quoting *Local 814, Int'l Bhd. of Teamsters v. NLRB*, 546 F.2d 989, 992 (D.C. Cir. 1976)). *Alpharma* thus requires a court to ask whether the party who provided the remand explanation was a "proper decisionmaker" and whether the remand explanation "represent[ed] the considered views of the agency itself." *Id.* at 7.

To establish that a Board vote was required to make Response One legitimate, Plaintiffs rely on § 635(b)(1)(B)(ii) of the Bank Act, which directs the "Board of Directors," when "authorizing any … guarantee," to "take into account any serious adverse effect of such … guarantee on the competitive position of United States industry … and employment." 12 U.S.C. § 635(b)(1)(B)(ii). But the *Delta I* remand explicitly did *not* require the Bank to issue new *authorizing* decisions for the Air India commitments as if the D.C. Circuit had vacated the original authorizations; rather, the Bank only was ordered to provide further *explanation* on remand in an effort to justify the authorizations that it already had made, not to revisit and reissue those decisions anew. *See Delta I*, 718 F.3d at 978 (refusing to vacate transactions and ordering that the Bank must "attempt to provide a reasonable *explanation*" justifying the

exportable goods screen, or "*explain*" the adverse effects of the Air India loan guarantees (emphasis added)).  As such, the Court finds that § 635(b)(1)(B)(ii) is inapplicable.[9]

The Court, moreover, finds no authority — whether in the APA, the Bank Act, or elsewhere — that requires a formal Board vote adopting Response One when it did not amount to the authorization of a financing decision but rather merely was an explanation of prior decisions.  *Cf. Menkes v. U.S. Dep't of Homeland Sec.*, 637 F.3d 319, 337 (D.C. Cir. 2011) (when no action by the Commandant or the Secretary of the Department of Homeland Security was required, Coast Guard "official" was found to be a proper decisionmaker); *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1317, 1325 (D.C. Cir. 1998) (when no action by the Commissioner was required, FDA director was found to be a proper decisionmaker); *Cardinal Health, Inc. v. Holder*, 846 F. Supp. 2d 203, 218-19 (D.D.C. 2012) (when no action by the Attorney General was required, DEA Administrator was found to be a proper decisionmaker).

Here, Response One was submitted to the Bank's senior staff and members of the Bank's Board for their review and comments, *see* Defs.' Mem. Opp'n Mot. Summ. J., ECF No. 35, Ex. A (E-mails from the Bank's General Counsel), and it was published on the Bank's website on November 22, 2013.  *See* AR at 1380.  Response One also makes clear that it represents "the

---

[9]        By comparison, in *Public Service Commission of New York v. FPC* ("*NY PSC*"), 543 F.2d 757 (D.C. Cir. 1974), and *Braniff Airways, Inc. v. CAB*, 379 F.2d 453 (D.C. Cir. 1967) — cases on which Plaintiffs rely — a formal vote was required when the agency decisions at issue *reconsidered* prior orders by the agencies.  *See NY PSC*, 543 F.2d at 776 ("Only as an entity can the Commission formulate valid original decisions; by the same token, only in that character can it fashion *new decisions remaking* those which it has already promulgated." (emphasis added); *Braniff Airways*, 379 F.2d at 458 (agency decision reconsidering an order awarding the right to serve a certain route to Eastern Air Lines over its competitor).  Here, the Bank's response to *Delta I* did not "remak[e]" any decisions as to the Air India transactions. Rather, on remand, the Bank provided an explanation through Response One for its adoption of the 2007 EIPs, which in turn supports the Bank's decision to approve the Five Transactions under those EIPs.

Bank's" experience, judgment, analyses, and conclusions, *see, e.g.*, *id*. at 1374, and it was signed and published in the name of the "Export-Import Bank of the United States." *Id*. at 1380. Because Response One clearly was drafted by the Bank and embodies the Bank's official position, the Court finds that, even without a vote by the Bank's Board, the response was prepared by the "proper decisionmaker" and represents "the views of the agency itself."[10] *Alpharma*, 460 F.3d at 7.  Thus, the Court finds that Response One is a permissible and official "explanation [on remand] for an inadequately articulated decision," *id.* at 6, and the Court therefore may consider the response as part of the administrative record.

That being said, Plaintiffs' complaint about the lack of a Board vote was addressed by Defendants during the course of this litigation.  Specifically, the Bank announced on April 10, 2014, that the Board would vote at its April 17 meeting about "whether to ratify and formally adopt the [Remand Responses and Remand Analyses]."  AR at 2144 (agenda for April 17, 2014, Board meeting).  Prior to the vote, the Bank's staff recommended that the Board adopt the remand papers "in recognition that [the papers] have represented and continue to represent the official position of the Bank," and that they "serve as the Bank's official responses to the litigation remands."  *Id.* at 2145; *see also id*. at 2145-47 (April 9, 2014, Board Memorandum).

---

[10]     *Alpharma, Inc. v. Leavitt*, a case on which Plaintiffs heavily rely, supports exactly why Response One is properly before the Court.  In *Alpharma*, the D.C. Circuit considered, and rejected, a challenge very similar to that which Plaintiffs raise here.  460 F.3d at 6-7.  Specifically, in the face of a claim that the FDA's response to a prior remand was an impermissible *post-hoc* rationalization, the circuit court held that "[t]here [was] no question that" the Associate Commissioner, who provided the agency's response by letter, "[was] a proper decisionmaker."  *Id*. at 7 (quotation marks omitted).  And as evidenced by the language in the letter — *e.g*., "Upon review, the *agency* has determined…" — it was clear that the "letter represent[ed] the considered views of the agency itself."  *Id*. (quotation marks omitted; emphasis in original).  Similarly here, Response One unquestionably represents the views of the agency, even prior to the Board's vote.

On April 14, 2014, Plaintiffs submitted a letter and supporting materials to members of the Board "urg[ing] the Board to reject the [remand papers]." *Id*. at 2152, 2155.  The Bank's staff reviewed Plaintiffs' materials and informed the Board that this submission "repeat[ed] arguments that [Plaintiffs have] made multiple times," both in "the several lawsuits brought by" Plaintiffs and in "comments" that Plaintiffs "submitted … in connection with various aircraft transactions." *Id*. at 2148.  Accordingly, the staff advised the Board that the materials did not "raise[] anything new that warrant[ed] changing either" the staff's recommendation that the Board ratify and adopt the remand papers or the substance of the remand papers themselves. *Id*. Thus, at its April 17, 2014, meeting, the Board unanimously voted to ratify and adopt the Remand Responses and the Remand Analyses. *Id*. at 2312.  Following the vote, Defendants supplemented the administrative record in this case with the materials relevant to the Board's actions. *See generally* Defs.' Notice Am. Admin. R., ECF No. 41.  Plaintiffs, however, object to Defendants' effort to amend the administrative record and ask the Court to reject the vote as procedurally defective. *See* Pls.' Suppl. Mem. Supp. Mot. Summ. J., ECF No. 43, at 5.  The Court finds no basis for doing so.

In resolving Plaintiffs' challenge to the Board's vote, the Court finds it significant that in *Delta I*, the D.C. Circuit gave Defendants broad discretion to determine how to act on remand, including the open-ended option to "take whatever other action the Bank deems appropriate to comply with the Bank Act and the APA." *Delta I*, 718 F.3d at 978.  This flexibility is consistent with the Supreme Court's pronouncement that, on remand, an agency retains "administrative discretion in deciding how, in light of internal organizational considerations, it may best proceed," and a reviewing court therefore "may not … dictat[e] to the agency the methods, procedures, and time dimension of the needed inquiry[.]" *Fed. Power Comm'n v. Transcon. Gas*

*Pipe Line Corp.*, 423 U.S. 326, 333 (1976); *see also Chenery*, 318 U.S. at 95 (explaining that the prohibition on *post-hoc* rationalizations is not intended to "enforc[e] formal requirements" or to "suggest[] that the [agency] must justify its exercise of administrative discretion in any particular manner or with artistic refinement").  Plaintiffs, however, ask the Court to violate this proscription by dictating specific procedures that the Bank should have followed in regard to when and how the Board voted, but the Court declines to do so absent any clear legal foundation for imposing such rules.  *See Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 541 (1978) ("[A]bsent extraordinary circumstances it is improper for a reviewing court to prescribe the procedural format an agency must follow[.]"); *see also Perez v. Mortg. Bankers Ass'n*, --- S. Ct. ---, No. 13-1041, 2015 WL 998535, at *7 (Mar. 9, 2015) (discussing the "longstanding principle[] of … administrative law jurisprudence" that "[b]eyond the APA's minimum requirements, courts lack authority 'to impose upon [an] agency its own notion of which procedures are 'best' or most likely to further some vague, undefined public good'" (citation omitted)).  As such, the Board's vote leaves no doubt that Response One represents the official position of the agency, and the vote further justifies why the Court should consider it here.

*Food Marketing Institute v. ICC*, 587 F.2d 1285 (D.C. Cir. 1978), another case on which Plaintiffs rely, also does not compel the Court to ignore Response One.  That decision's warning against "[p]ost-hoc rationalizations by the agency on remand," *id.* at 1290, occurred after the court already had concluded that the agency's position was "defective" — not just insufficiently explained, as in *Delta I* — and the court therefore had "vacated" the decision — in contrast to remand without vacatur in *Delta I.  See id.* at 1288.  The agency then issued a new decision reaching the same conclusion as in the decision previously vacated, leading the D.C. Circuit to caution that

> [t]he agency's action on remand must be more than a barren exercise of supplying reasons to support a pre-ordained result.  Post-hoc rationalizations by the agency on remand are no more permissible than are such arguments when raised by appellate counsel during judicial review.

*Id*. at 1290 (citation omitted).  This statement therefore addresses the potential problem of closed-mindedness when an agency is required to make a new decision on remand, which is different than the circumstances here, where the *Delta I* remand occurred in order for the agency to provide a fuller articulation of its reasoning in support of prior decisions that themselves were left undisturbed.

Finally, Plaintiffs suggest that *Chenery* prevents the Court from considering Response One, but the Court disagrees.  *Chenery* stands for the proposition that when Congress has delegated "a determination of policy or judgment which the agency alone is authorized to make and which it has not made, a judicial judgment cannot be made to do service for an administrative judgment."  *Chenery*, 318 U.S. at 88.  Consistent with *Chenery*, it often is stated that "the courts may not accept … counsel's *post hoc* rationalizations for agency action."  *State Farm*, 463 U.S. at 50; *see also Women Involved in Farm Econ.* ("*WIFE*") *v. U.S. Dep't of Agric.*, 876 F.2d 994, 998 (D.C. Cir. 1989) (explaining that *Chenery* "ordinarily prevents agency counsel from proffering alternative theories — not explicitly embraced by a department or agency head — to support a challenged regulation").  But here, there is no issue of counsel for the Bank presenting *post-hoc* rationalizations because Response One was prepared by the agency, not its counsel.[11]

---

[11]     *Chenery* and the prohibition on *post-hoc* rationalizations also may be inapplicable for a second reason: "if an agency [has] no obligation to explain its actions contemporaneously, … the entire record, or a good part of it, is actually created for the sole purpose of judicial review" such that "much that is presented to the court is developed *post-hoc*."  *WIFE*, 876 F.2d at 999.  As Judge Boasberg noted in *ATA*, it appears that the Bank is not subject to the APA's notice-and-comment rulemaking procedures when it formulates new EIPs, including the APA's requirement in 5 U.S.C. § 553(c) that an agency publish "a concise general statement of [the]

24

In sum, the Court concludes that Response One provides the type of "amplified articulation" that an agency is permitted to — and, here, required to by the D.C. Circuit — provide on remand; accordingly, examination of Response One's contents is perfectly appropriate.[12]  *See Alpharma*, 460 F.3d at 6 ("Needless to say, if it is appropriate for a court to remand for further explanation, it is incumbent upon the court to consider that explanation when it arrives."); *Local 814*, 546 F.2d at 992 ("The policy of the post hoc rationalization rule does not prohibit the [agency] from submitting an amplified articulation [for its actions].  Moreover, the logic of the rule requires it.  If a reviewing court finds the record inadequate to support a finding of reasoned analysis by an agency and the court is barred from considering rationales urged by others, only the agency itself can provide the required clarification.").

### B.  Plaintiffs' Challenges To The 2007 EIPs And The Exportable Goods Screen

Having settled that Response One is properly before the Court, the Court next turns to evaluating whether the Bank's adoption of the exportable goods screen as part of the 2007 EIPs was contrary to the APA or the Bank Act.  In particular, Defendants ask the Court to find that the

---

basis and purpose" of its actions.  *See ATA*, 878 F. Supp. 2d at 73.  In such circumstances, the "core consideration that supports *Chenery* — that the *agency* rather than the *judiciary* supply the reasons for issuing a rule so as not to interfere with the agency's future deliberations" — is inapplicable.  *WIFE*, 876 F.2d at 1000 (emphasis in original).  Accordingly, the D.C. Circuit has noted the lack of any case "in which the Supreme Court has applied *Chenery*'s proscription against crediting counsel's explanations to the review of agency action exempt from the APA's requirement of a contemporaneous explanation of the action's basis or purpose."  *Id*. at 999 (collecting cases).  Instead, courts "accept[] … *post-hoc* justifications when [the] agency making [the] rule had no duty to make a record."  *Lever Bros. Co. v. United States*, 877 F.2d 101, 105 (D.C. Cir. 1989) (citing *WIFE*, 876 F.2d at 998-1000).  Plaintiffs do not challenge Judge Boasberg's statement in *ATA* that the Bank was not required to engage in notice-and-comment procedures when it adopted the 2007 EIPs, and the Court does not address here whether such procedures were required when the Bank adopted the 2013 EIPs and Guidelines, as Plaintiffs now allege.

[12]     To hold otherwise as to Response One would render illogical the D.C. Circuit's remand order in *Delta I* calling for further analysis, as this Court would effectively be punishing the Bank and the Board for doing exactly what the circuit court ordered it to do.

screen was the product of the Bank's well-reasoned determination that transactions in which the export was to be used by the foreign purchaser to provide a service — and not to produce an exportable good — were unlikely to cause a substantial or serious adverse economic impact on U.S. industry and employment.  *See* Defs.' Mem. Supp. Mot. Summ. J., ECF No. 30-1, at 21-22. Plaintiffs, however, disagree that the exportable goods screen represents the culmination of rational agency decisionmaking and instead contend that the screen cannot be reconciled with the Bank Act.  *See* Pls.' Mem. Opp'n Mot. Summ. J., ECF No. 36, at 15.

Turning to Plaintiffs' substantive challenge, the Court begins, as it must, with the relevant statutes.  In particular, Plaintiffs maintain that the exportable goods screen does not reasonably serve the Bank Act's objectives, as proclaimed through three related provisions.  First, § 635 specifies that, among other considerations, the agency "shall take into account any serious adverse effect of [a proposed] loan or guarantee on the competitive position of United States industry … and employment in the United States, and shall give particular emphasis to the objective of strengthening the competitive position of United States exporters and thereby of expanding total United States exports."  12 U.S.C. § 635(b)(1)(B)(ii).  Second, the Bank Act provides that the agency "may not extend [financing support] for establishing or expanding production of any commodity for export by any country other than the United States[] if … the Bank determines that the extension of such [support] will cause substantial injury to United States producers of the same, similar, or competing commodity," *id*. § 635(e)(1), unless "in the judgment of the Board of Directors of the Bank, the short- and long-term benefits to industry and employment in the United States are likely to outweigh the short- and long-term injury to United States producers and employment of the same, similar, or competing commodity."  *Id*. § 635(e)(3).  And third, the Bank Act requires that the "Bank shall implement such regulations and

procedures as may be appropriate to insure that full consideration is given to the extent to which

any loan or financial guarantee is likely to have an adverse effect on industries … and

employment in the United States."  *Id.* § 635a-2.

Though these provisions utilize somewhat different language, it is undisputed that, taken

together, they require the Bank to consider (or, more accurately, "take into account") the

potential adverse effects of its loans and loan guarantees on U.S. industry and employment.

Plaintiffs insist, however, that the Bank, through the exportable goods screen, ignores this

fundamental statutory mandate altogether.  *See* Pls.' Mem. Opp'n Mot. Summ. J., ECF No. 36, at

28.  Such failure, Plaintiffs contend, renders the Bank's decision to approve the Five

Transactions under the 2007 EIPs arbitrary and capricious.[13]  *See, e.g.*, *Overton Park*, 401 U.S.

at 416-17 (agency acted arbitrarily and capriciously when decision was not "based on a

consideration of the relevant factors" and failed to "follow[] the necessary procedural

requirements"); *United Mine Workers of Am., Int'l Union v. Dole*, 870 F.2d 662, 673 (D.C. Cir.

1989) (agency acted arbitrarily and capriciously due to "complete absence of any discussion" of

statutorily required element).  Defendants, on the other hand, argue that consideration of the

statutorily mandated factors occurred at the time the 2007 EIPs were adopted and then applied to

the Five Transactions.  *See* Defs.' Reply Supp. Mot. Summ. J., ECF No. 37, at 14-15.  The

Court, then, must decide whether the institution and application of the exportable goods screen

sufficed to discharge the Bank's obligations under the Bank Act.  In the end, the Court finds that

the screen represents a reasonable attempt by the Bank to comply with its modest statutory

obligations.  Accordingly, the Court finds in favor of Defendants.

---

[13]     Plaintiffs also object to the Bank's application of the 2007 EIPs to the Five
Transactions in the first place, arguing instead that the 2013 EIPs and Guidelines should have
been used originally.  The Court addresses this question at Part IV.C., *infra*.

1.  Standard Of Review

To determine whether the exportable goods screen is a permissible construction under the Bank Act, the Court first must determine how much deference is owed to the agency.[14] Defendants argue that the Bank is entitled to the level of deference afforded by the framework set out in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *See* Defs.' Mem. Supp. Mot. Summ. J., ECF No. 30-1, at 22.  Plaintiffs, however, assert that the two-step *Chevron* analysis is inapplicable.  *See* Pls.' Mem. Opp'n Mot. Summ. J., ECF No. 36, at 25.

It is well established that "not all statutory interpretations by agencies qualify for [*Chevron*] deference."  *Pub. Citizen, Inc. v. U.S. Dep't of Health & Human Servs.*, 332 F.3d 654, 659 (D.C. Cir. 2003) (citations omitted).  Thus, the Supreme Court has explained that "[d]eference in accordance with *Chevron* … is warranted only 'when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority.'" *Gonzales v. Oregon*, 546 U.S. 243, 255-56 (2006) (quoting *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001)).  But as Judge Boasberg noted in *ATA*, there is no "clear answer" about whether *Chevron* deference should apply to the Bank's creation of the exportable goods screen.

---

[14]     The Court notes initially that it is the exportable goods screen, which expresses the Bank's interpretation of the Bank Act, and not Response One itself that is owed deference. In deciding whether the Bank has provided a reasoned explanation for its interpretation and has not acted arbitrarily and capriciously, the Court looks to Response One and the rest of the administrative record.  *See Menkes*, 637 F.3d at 330-33 (deferring to the agency's statutory interpretation articulated on remand, "especially given the instruction from this court to the agency to come to grips with the meaning of the statute" (quotation marks and citation omitted)). As such, Plaintiffs' argument that Response One is not entitled to deference because it "has never been adopted by the Board as its own reasoning" was unnecessary, and anyways, the argument became moot when the Board voted to adopt the remand papers in April 2014.  *See* Pls.' Mem. Opp'n Mot. Summ. J., ECF No. 36, at 26.

*See ATA*, 878 F. Supp. 2d at 72 ("The application of [the *Gonzales*] standard to the EIPs … does not yield a clear answer.").

This is because, on the one hand, Congress clearly delegated to the Bank and the Board broad authority to make loan guarantees such as those at issue here, *see* 12 U.S.C. § 635(a)(1), (b)(1), and Congress also required the agency to "take into account" certain factors — such as potential "serious adverse effect[s]" of a transaction, *id.* § 635(b)(1)(B)(ii), and whether a transaction would "cause substantial injury" to U.S. industries, *id.* § 635(e)(1)(B) — when determining whether to approve or deny an application for financing.  Congress, moreover, explicitly directed the Bank to "implement such regulations and procedures as may be appropriate to insure that full consideration is given to the extent to which any loan or financial guarantee is likely to have an adverse effect on industries." *Id.* § 635a-2.  Congress therefore left it to the agency to determine how "adverse effects" should be analyzed, and the exportable goods screen represents the agency's judgment as to matters within its area of expertise. *Cf. Barnhart v. Walton*, 535 U.S. 212, 222 (2002) (applying *Chevron* because of, *inter alia*, the "interstitial nature of the legal question" and the "related expertise of the Agency").

On the other hand, the 2007 EIPs plainly are not the product of "either a notice-and-comment rulemaking or a formal adjudication, the usual suspects for *Chevron* deference." *Cal. Valley Miwok Tribe v. United States*, 515 F.3d 1262, 1266 (D.C. Cir. 2008); *see also Mount Royal Joint Venture v. Kempthorne*, 477 F.3d 745, 754 (D.C. Cir. 2007) ("If the agency enunciates its interpretation through notice-and-comment rule-making or formal adjudication, we give the agency's interpretation *Chevron* deference.").  Though "'the want of' notice and comment 'does not decide the case'" against *Chevron* deference, *see Barnhart*, 535 U.S. at 222 (quoting *Mead*, 533 U.S. at 230-31), it also is not certain that the 2007 EIPs carry the force of

law.  Instead, the EIPs might more accurately be described as non-binding internal guidelines —
akin to "'interpretations contained in policy statements, agency manuals, and enforcement
guidelines,'" which historically are "beyond the *Chevron* pale," *Mead*, 533 U.S. at 234 (quoting
*Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000)) — rather than the formal and binding
legislative rules that usually benefit from *Chevron* deference.  *See Motion Picture Ass'n of Am.,
Inc. v. FCC*, 309 F.3d 796, 801 (D.C. Cir. 2002) ("[E]ven if an agency has acted within its
delegated authority, no *Chevron* deference is due unless the agency's action has the 'force of
law.'" (quoting *Mead*, 533 U.S. at 227)).

Ultimately, then, this Court finds itself at the same impasse as Judge Boasberg in *ATA*
regarding what level of deference is owed to the Bank's interpretation of the Bank Act through
the EIPs.  *See ATA*, 878 F. Supp. 2d at 72-73 (examining, but ultimately not deciding, whether
*Chevron* applies to the exportable goods screen).  And like in *ATA*, this Court finds that it is
unnecessary to resolve the enigmatic *Chevron* question because "to hold that an agency decision
'do[es] not fall within *Chevron* is not … to place [it] outside the pale of any deference
whatever.'"  *Fox v. Clinton*, 684 F.3d 67, 76 (D.C. Cir. 2012) (quoting *Mead*, 533 U.S. at 234;
alterations in *Fox*).  Instead, even when an agency's interpretation of its governing statute is not
entitled to *Chevron* deference, courts still give credit to agency interpretations to the extent such
credit is due.  *See id*.  Specifically, consistent with the Supreme Court's decision in *Skidmore v.
Swift & Co.*, 323 U.S. 134 (1944), "'[t]he weight [accorded to an administrative] judgment in a
particular case will depend upon the thoroughness evident in its consideration, the validity of its
reasoning, its consistency with earlier and later pronouncements, and all those factors which give
it power to persuade, if lacking power to control.'"  *Mead*, 533 U.S. at 228 (quoting *Skidmore*,
323 U.S. at 140; second alteration in *Mead*).

After consideration of the *Skidmore* factors, this Court, like that in *ATA*, finds that the exportable goods screen deserves considerable deference.  *See ATA*, 878 F. Supp. 2d at 73 (*Skidmore* "considerations counsel in favor of lending significant weight to the interpretation of §§ 635(b)(1)(B) and 635a-2 set forth in the [2007] EIPs").  Though amendments have occurred from time-to-time to reflect new considerations imposed by Congress, the Bank has used comprehensive EIPs in some form since 1979 as a framework for evaluating potential transactions.[15]  *See* AR at 1368-69.  During this period, the Bank accumulated decades of expertise regarding the airline sector and other industries, and critically, the Bank has long used that expertise to develop various procedural filters, including the exportable goods screen, that block from further in-depth analysis categories of transactions that the Bank, in its considered judgment, deems to be unlikely to produce a substantial adverse impact on domestic industry and employment.  *See id.* at 1375.  These procedures, moreover, are crafted within the sparse guidelines provided by Congress regarding *how* the Bank should consider the various competing statutory mandates in the Bank Act, which, in turn, gives the agency substantial discretion to use its expertise to fill in those gaps as it sees fit.  *See ATA*, 878 F. Supp. 2d at 73 ("[T]he question of how 'adverse effects' on domestic industry and employment should be identified and weighted is squarely within the category of inquiries the Ex-Im Bank's expertise puts it in the best position to

---

[15]     The Bank has, for many decades, implemented EIPs to screen out transactions that it predicted were unlikely to have serious adverse effects on U.S. industry.  *See* AR at 1375.  Thus, early on, the Bank determined that the best way to do so was by categorizing transactions that had certain characteristics — which the Bank's expertise indicated were unlikely to result in a substantial adverse effect domestically — and exclude those transactions from further in-depth economic impact review.  *Id.*  For example, in the Bank's first set of EIPs from 1979, the Bank determined that exports involving certain kinds of capital equipment (*e.g.*, locomotives) and certain projects (*e.g.*, power plants) were not likely to have any serious adverse impact domestically because they resulted in foreign localized goods or services with only local economic effects.  *See id.* at 1368-69.

answer."). Thus, the Court concludes that, at the very least, the Bank's interpretation of the Bank Act through the exportable goods screen, which "represent[s] the culmination of multiple generations of Bank officials' expertise," *id.*, deserves significant deference.

### 2. The Bank's Use Of A Categorical Screen Generally

Before reaching the merits of the exportable goods screen itself, the Court first must address Plaintiffs' argument that *any* categorical screen that prevents in-depth economic analysis for certain transactions is inconsistent with the Bank Act because such a screen does not, in and of itself, afford "full consideration" to the factors mandated by Congress. *See* Pls.' Mem. Opp'n Mot. Summ. J., ECF No. 36, at 19; *id.* at 28 (arguing that the "exportable-good screen was effectively a refusal — announced in advance — to consider statutorily mandated factors in the vast majority of transactions that the Bank approved"). Indeed, in many ways, Plaintiffs' complaint appears to be primarily that the Bank should never use categorical screens and should instead subject all, or maybe just nearly all, pending transactions to in-depth economic impact analysis. The Court finds that such an argument is inconsistent with both the Bank Act and the prior court decisions addressing this issue.

Specifically, as Judge Boasberg recognized in *ATA*, "multiple provisions of the Bank Act contemplate [the possibility of] categorical decisionmaking." *ATA*, 878 F. Supp. 2d at 74. For example, § 635a-2 requires that the agency "implement such *regulations and procedures* as may be appropriate to insure … full consideration" of adverse effects, 12 U.S.C. § 635a-2 (emphasis added), which indicates that the Bank was not just permitted to develop a policy for making "adverse effects" determinations, but rather that it was expected to do so. In addition, § 635(e)(7)(A) provides that certain procedural requirements apply only "*[i]f* … the Bank conducts a detailed economic impact analysis." *Id.* § 635(e)(7)(A) (emphasis added). Congress's use of

the conditional language "if" strongly suggests that detailed economic impact analysis is not

expected to be performed for every financing decision, which, in turn, implies that the Bank may

create procedures for distinguishing between those transactions that require detailed analysis and

those that do not.[16]  *See ATA*, 878 F. Supp. 2d at 80 ("Nothing in § 635(e)(7) supports Plaintiffs'

contention that the Bank is obligated to perform detailed economic-impact analyses for every

transaction.").

Further, the D.C. Circuit in *Delta I*, in reliance on the plaintiffs' litigation position there,

appeared to treat this question as a foregone conclusion accepted by all parties:

> The dispute here arises because the procedures *categorically* determine that loans
> and loan guarantees to foreign *service* providers will not affect U.S. industries and
> U.S. jobs.  *Delta acknowledges that categorical assessments are permissible
> under the Act in appropriate circumstances*….  The real disagreement between
> the parties, then, is whether the Bank's categorical assessment of the impact of
> loans and loan guarantees to foreign service providers is a reasonable application
> of the Bank Act[.]

*Delta I*, 718 F.3d at 978 (citation omitted; third emphasis added).  In addition, given the volume

of applications the Bank receives each year — approximately 3,800 in Fiscal Year 2012, for

example, *see* AR at 1374-75 — it would be nearly impossible for the Bank to accomplish its

statutory mission of promoting U.S. exports if it were required to perform in-depth economic

analysis for every transaction, or even for a significant percentage of transactions.  *See id.* at

1374 (detailed economic impact analysis "can substantially delay the processing of a transaction

---

[16]        This also is confirmed by the legislative history of the Bank Act, which provides
that

> the Committee recognizes the need for [the Bank] to respond to exporters'
> requests … in a timely and confidential fashion and intends that the Bank
> implement its adverse economic impact analysis procedures in a practical and
> workable fashion.  *The bill does not require the Bank to conduct further analysis
> if it views its existing body of knowledge as sufficient.*

S. Rep. No. 99-274, at 8 (1986) (emphasis added).

and jeopardize the ability of the U.S. exporter to capture the export opportunity"); *id.* at 1374-75

(given the thousands of applications the Bank receives each year, "the Bank would not be able to

accomplish its mission of promoting U.S. exports if it were to perform a 'detailed economic

impact analysis' on every transaction, or even for a significant percentage of the transactions").

Indeed, the Bank very likely would grind to a halt if such an approach were mandated by this

Court, which cannot reasonably be considered consistent with the Bank Act's purpose. *See, e.g.*,

12 U.S.C. § 635(b)(1)(B) (it is "the policy of the United States … to support United States

exports at rates and on terms and conditions which are fully competitive with exports of other

countries"); *cf. United States v. Am. Trucking Ass'ns, Inc.*, 310 U.S. 534, 543 (1940) ("When

[one possible statutory] meaning has led to absurd or futile results … this Court has looked

beyond the words to the purpose of the act."); *United States ex rel. Davis v. District of Columbia*,

34 F. Supp. 3d 30, 49 (D.D.C. 2014) ("When faced with two potential interpretations of the

statutory phrase …, one of which leads to an absurd conclusion, the Court is on firmer ground

interpreting the statute to avoid that absurdity." (citations omitted)).

    The Court, moreover, simply is not persuaded by Plaintiffs' argument that the Bank, by

applying a categorical screen rather than performing individual analyses, fails to consider a

factor required by the Bank Act.  Instead, this Court agrees with *ATA*, where Judge Boasberg

rejected a similar argument, explaining that

> [b]y instituting a series of screens intended to identify those transactions most
> likely to pose a significant risk of "adverse effects," the Bank "ensure[d] that all
> transactions are screened for economic impact implications" while simultaneously
> reserving its limited resources for "those cases that require further economic
> impact analysis through a more extensive process."

*ATA*, 878 F. Supp. 2d at 75 (citations omitted).  Similarly, the Court in *ATA* found that

> Plaintiffs' allegation that the screens serve to remove "transactions from *any*
> consideration for *any* adverse impacts," entirely mischaracterizes their operation.
> *When the EIPs operate to exempt applications from more in-depth analysis, that*

> *does not mean that the Bank did not consider the adverse effects of those transactions.*  Instead, by applying its EIPs, the "Bank reviews all transactions it receives for potential economic impact."

*Id.* (citations omitted; third emphasis added).  Likewise here, the Court finds that both the initial decision that resulted in the institution of the EIPs and their subsequent application to individual transactions qualify as consideration of "adverse effects."  Accordingly, this Court, like those in *ATA* and *Delta I*, concludes that the Bank is authorized to adopt categorical screens in an attempt to limit further analysis to only those transactions that are "likely to have an adverse effect on industries … and employment in the United States."[17]  12 U.S.C. § 635a-2.

Finally, Plaintiffs criticize the exportable goods screen because it removed nearly 92% of all applications for Bank financing from in-depth economic impact analysis.  *See* Pls.' Mem. Opp'n Mot. Summ. J., ECF No. 36, at 30 (citing AR at 1474).  If Congress desired to make detailed economic impact analysis mandatory for a greater percentage of transactions, it certainly was free to do so.  But instead, Congress has left it to the Bank to determine both how the

---

[17]    The use (and approval) of categorical screens is not unique to the Bank.  For example, in *Lopez v. Davis*, 531 U.S. 230 (2001), a plaintiff challenged a Bureau of Prisons ("BOP") regulation that categorically excluded from eligibility for early release those inmates convicted of a felony involving a firearm.  The underlying statute had identified one class of inmates ineligible for early release and additionally had provided that the BOP "may" reduce sentences for other inmates.  The plaintiff argued that the BOP could not delineate a new category of ineligible inmates (*i.e.*, all firearm offenders) in addition to those already identified by Congress, but rather must make a case-by-case determination as to each inmate's eligibility.  *Id.* at 239.  The Supreme Court disagreed: "The [BOP] is not required continually to revisit issues that may be established fairly and efficiently" by rendering a single, categorical decision.  *Id.* at 244 (citation and quotation marks omitted).  Rather, the BOP had "reasonably concluded" that firearm offenders, as a group, were unlikely to deserve early release, and the BOP therefore could exclude all such offenders without a further, individual evaluation.  *Id.*  As the Supreme Court explained, even when a statutory scheme requires "individualized determinations," the agency may have the authority to rely on categorical judgments "unless Congress clearly expresses an intent to withhold that authority."  *Id.* at 241, 244 (citation and quotation omitted).  This Court finds no such clear intent in the Bank Act to restrict the Bank's authority in that regard.

"adverse effects" of a transaction ought to be identified and when an in-depth inquiry is merited. In addition, that few transactions meet the Bank's criteria for requiring a detailed economic impact analysis does not, by itself, compel the Court to find that the Bank's line drawing was arbitrary and capricious or contrary to the Bank Act.[18]  *See WorldCom, Inc. v. FCC*, 238 F.3d 449, 462 (D.C. Cir. 2001) (courts are "generally unwilling" to question agency line drawing "unless a petitioner can demonstrate that lines drawn … are patently unreasonable, having no relationship to the underlying regulatory problem" (citation and quotation omitted)).

### 3.  Merits Of The Exportable Goods Screen

The critical question thus becomes whether the line drawn by the Bank in adopting the exportable goods screen was "a reasonable policy choice for the agency to make," or whether the agency's decision was arbitrary and capricious or contrary to the Bank Act, as Plaintiffs claim. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 986 (2005) (citation and quotation omitted).  To answer this question, the Court feels compelled to start by noting that the Bank Act creates far more questions than it answers regarding how the Bank should implement the statutory scheme.  Indeed, the obligations imposed on the agency by the Bank Act are, at best, modest and, at worst, riddled with gaps that must be filled by the Bank. For instance, how is the Bank to determine whether serious adverse effects on U.S. airlines are likely to result from the Bank's provision of financing support to a foreign airline intending to purchase a U.S.-manufactured aircraft?  And, for that matter, what meaning should the Bank give to statutory terms such as "serious" in § 635(b)(1)(B)(ii) or "likely" in § 635a-2?

---

[18]     Judge Boasberg rejected a similar argument raised by the plaintiffs in *ATA*, concluding that "[i]f Congress wishes to make detailed economic-impact analyses mandatory for a greater percentage of — or for certain categories of — transactions, it may certainly do so." *ATA*, 878 F. Supp. 2d at 77.

Competing statutory considerations also are at play.  For example, without question, the Bank's fundamental mission is to support U.S. jobs by facilitating U.S. exports, which, in turn, requires the Bank's financing to be "fully competitive" with foreign ECAs' support of their own exports.  *See* 12 U.S.C. § 635(a)(1) (the Bank is "to contribute to maintaining or increasing employment of United States workers"); *id.* § 635(b)(1)(B)(ii) (the Bank is to "give particular emphasis to the objective of strengthening the competitive position of United States exporters and thereby of expanding total United States exports"); *id.* § 635(b)(1)(B) (Bank loans shall include rates, terms, and conditions that are "fully competitive with exports of other countries, and consistent with international agreements").  And in requiring the Bank to be "fully competitive," Congress emphasizes that the Bank must process financing applications efficiently so as to prevent a U.S. exporter from losing an export opportunity.  *See id.* § 635(b)(1)(B) (the Bank's loans should "neutralize the effect of … foreign credit on international sales competition"); *see also* S. Rep. No. 92-51, at 2 (1971) (the Bank Act affords the Bank "broad authority to manage and finance its operations in the most economical and efficient manner in order to meet the changing export credit needs of the U.S. exporter").  In fact, even when Congress added a provision regarding adverse economic impact, it still emphasized "the need for [the Bank] to respond to exporters' requests for support in a timely … fashion," and directed that the Bank "implement[]" the provision "in a way that does not reduce the Bank's competitiveness and flexibility in assisting U.S. exporters nor ignore the positive aspects of the export sale."  S. Rep. No. 99-274, at 8 (1986); *see also* Pub. L. No. 99-472, § 11, 100 Stat. 1200, 1203-04 (1986) (codified at 12 U.S.C. § 635(e)(1)).

Thus, the Bank has construed Congress's intent, as relayed through the Bank Act, to be that the Bank must evaluate "transactions efficiently so as not to impede the transactions, which

often need to proceed expeditiously to capture the export opportunity," and must "focus its adverse impact analysis only on those instances where the potential adverse effect is substantial." AR at 1366. The Bank Act, though, does not answer *how* the Bank should balance these competing obligations, and the exportable goods screen is the Bank's attempt to perform that balancing. *See id.* at 1371; *see also Fresno Mobile Radio, Inc. v. FCC*, 165 F.3d 965, 971 (D.C. Cir. 1999) ("When an agency must balance a number of potentially conflicting [statutory] objectives,... judicial review is limited to determining whether the agency's decision reasonably advances at least one of those objectives and its decisionmaking process was regular." (citation omitted)). Though the Court finds this to be an eminently reasonable interpretation of what the Bank Act demands from the Bank when processing financing applications, such an understanding does not resolve whether the categorical goods screen itself represents rational agency decisionmaking.[19]

Answering that question is complicated, but in attempting to do so, significant deference is owed to the agency. In particular, by allowing the Bank to adopt categorical screens, the Bank Act implicitly leaves to the Bank the responsibility for making difficult predictive judgments about the potential economic effects of its future loans and loan guarantees. At the same time, the gaps and ambiguities in the Bank Act also leave it to the Bank to apply its experience and

---

[19]     Significantly, the Bank Act does not require the Bank to determine whether aircraft financing will *never* harm U.S. airlines. Instead, the question is one of probability, not certainty. *See* 12 U.S.C. § 635a-2 (requiring the Bank to consider "*likely* … adverse effect[s]" (emphasis added)). Categorical screens are one mechanism for making that prediction in an efficient manner, as the Bank Act demands. *Cf. Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 879 (D.C. Cir. 1992) (noting that in Freedom of Information Act ("FOIA") jurisprudence, "[t]he Supreme Court has encouraged the development of categorical rules whenever a particular set of facts will lead to a generally predictable application of FOIA," and "'[o]nly by construing the [FOIA] Exemption to provide a categorical rule can [FOIA]'s purpose of expediting disclosure by means of workable rules be furthered'" (quoting *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 779 (1989))).

technical expertise regarding the impact of its financing decisions on specific domestic industries in making this prediction.  In such situations, the D.C. Circuit has described the APA's arbitrary and capricious standard as "particularly deferential."  *AD HOC Telecom. Users Comm. v. FCC*, 572 F.3d 903, 908 (D.C. Cir. 2009) (arbitrary and capricious "standard is particularly deferential in matters such as this, which implicate competing policy choices, technical expertise, and predictive market judgments" (citations omitted)); *see also Rural Cellular*, 588 F.3d at 1105 ("The 'arbitrary and capricious' standard is particularly deferential in matters implicating predictive judgments[.]" (citations omitted)).  "Thus, when an agency's decision is primarily predictive, [a court's] role is limited; [courts] require only that the agency acknowledge factual uncertainties and identify the considerations it found persuasive."[20]  *Rural Cellular*, 588 F.3d at 1105 (citation omitted).

### a.  Expertise, Experience, And The Bank's Understanding Of The Aircraft Financing Market

The Court now turns, at last, to considering the Bank's justifications for the exportable goods screen.  As a preliminary matter, Plaintiffs immediately question the level of the Bank's expertise, arguing that the Bank offers only "broad generalities" in Response One rather than meaningful evidence to establish the agency's expertise and experience in understanding the aircraft financing market.  *See* Pls.' Mem. Opp'n Mot. Summ. J., ECF No. 36, at 31.  The Court recognizes that, given the exportable goods screen's categorical exclusion, the Bank has not,

---

[20]     The legislative history of the Bank Act supports the Court's conclusion that the Act was intentionally drafted to give considerable leeway to the Bank in crafting its internal procedures for financing transactions.  For example, legislators initially proposed that the Bank "should … not authorize" financing support "which may have serious adverse effects" on U.S. industry and employment, S. Rep. No. 93-1097, at 19 (1974) (emphasis omitted), but § 635(b)(1)(B) was amended to its current form, including the requirement that the Board "shall take" such adverse effects "into account," not that the Bank cannot authorize a transaction when adverse effects may exist.  *See* S. Conf. Rep. No. 93-1335, at 3, 8 (1974).  Thus, what began as a prohibition became, in the final version, merely one factor among many to be considered.

until recently, subjected aircraft financing transactions to in-depth economic impact analysis. The Bank does, however, have much experience with global financial markets generally and the aircraft financing market in particular.

Of note, the Bank has evaluated financing transactions across numerous industries under various economic impact provisions for more than forty-five years, with the Bank reviewing upwards of several thousand applications for financing in any given year. *See* AR at 1374, 1377. In addition, both before and after the adoption of the exportable goods screen in 2001, the Bank has been directly involved in negotiations with other ECAs regarding evolving iterations of the Aircraft Sector Understanding ("ASU"), which is an agreement between multiple ECAs, including the Bank, to establish the official financing terms and conditions that ECAs can offer for wide-body aircraft transactions. *See id.* at 1377. Further, as Response One explains, the Bank gained much experience with the aircraft financing market leading up to the adoption of the exportable goods screen in 2001 through its financing of 440 U.S.-manufactured aircraft between 1990 and 1999, which totaled an export value of approximately $22 billion. *See id.* at 1376. Thus, the Bank has been active in the aircraft financing market for many years, which, along with its longstanding role in financing transactions and evaluating economic impact in other industries, establishes the agency as knowledgeable and experienced in this area.

Turning to the Bank's explanation for the exportable goods screen, the Bank understood from the hundreds of aircraft transactions it has financed that, for many years, U.S. airlines generally had access to financing at costs that were more favorable than the costs of aircraft financing provided by ECAs, such as the Ex-Im Bank. *See id.* at 1374. For example, the Bank understood that U.S. airlines often had access to favorable financing tools — such as leveraged

leases[21] and enhanced equipment trust certificates ("EETCs")[22] — that were not available to

foreign airlines at the time and that were more favorable than the cost of financing provided by

the Ex-Im Bank and the European ECAs.  *See id.* at 1376-77; *see also id.* at 1383-89 (discussing

financial tools available to U.S. airlines).  Because of these alternatives, the Bank has long

predicted that U.S. airlines were unlikely to be harmed by Ex-Im Bank financing to foreign

airlines, as U.S. airlines usually had access to more favorable, or at least equally as favorable,

financing than the Bank was providing.[23]  *See id.* at 1379-80.

Additionally, in the area of aircraft financing, certain member countries of the

Organization for Economic Cooperation and Development ("OECD"), including the United

---

[21]    In contrast to ECA financing, in the 1980s and 1990s the main method used by U.S. airlines to acquire aircraft was a leveraged lease.  *See* AR at 1376.  A leveraged lease provides tax benefits to an entity that wants to shelter income through additional tax deductions.  *See id.*  That entity purchases the aircraft and then leases it to the airline, and the purchaser, as the owner, thus can take the depreciation deductions and investment tax credits during the term of the lease.  *See id.*  The Bank's experience revealed that, for multiple reasons, leverage leases were a favorable financing tool in comparison to Ex-Im Bank financing.  *See id.*

[22]    EETCs allow creditors to provide more favorable financing terms to U.S. airlines than those available to foreign airlines because of the unique protection of § 1100 of the U.S. Bankruptcy Code.  *See* AR at 1376-77, 1401.  It is only recently that an international EETC market has begun to develop because of the Cape Town Convention — for which, interestingly, it appears that none of the countries involved in the Five Transactions are eligible.  *Id.* at 1401 n.7.

[23]    Importantly, the Bank need not establish that U.S. airlines *always* can secure better financing on private markets, nor has the Bank made such an assumption here.  *Cf.* Pls.' Mem. Opp'n Mot. Summ. J., ECF No. 36, at 36 (mistakenly arguing that "the Bank attempts to justify its exportable-good screen on the basis … that the screen could not possibly have caused any harm because U.S. airlines always do better in the private credit markets").  Instead, it is sufficient for the Bank to use its experience and expertise to make assumptions about financing conditions *generally*, rather than establishing absolutes; that is the very point of categorical screens, and such an approach is consistent with the Bank Act's mandate that the Bank determine if adverse effects are "likely," not if such effects will never occur.  *See Lopez*, 531 U.S. at 244 (upholding categorical screen when BOP "reasonably concluded" that certain factors "suggest[]" an inmate should not get early release, and not requiring BOP to prove that such inmates are always bad candidates for release).

States, have entered into a series of agreements, the ASU, regarding ECA financing for aircraft. *See id*. at 1377.  The ASU in place around 2001 established the most favorable terms and conditions that ECAs could offer for the sale or lease of aircraft, and those terms and conditions, in the Bank's experience, resulted in financing that was "significantly more expensive than that which could be obtained by U.S. airlines in the private market."  *See id*.  The Bank therefore understood that when it first adopted the exportable goods screen in 2001, its own financing terms, as set by the then-applicable ASU, were significantly more expensive than the terms available privately to U.S. airlines, and as such, the Bank anticipated that its financing would not pose serious adverse economic harm to U.S. airlines at that time.  *See id*.

Plaintiffs nonetheless criticize Response One as relying on "unstated inferences" or "unsupported assertions."  *See* Pls.' Mem. Opp'n Mot. Summ. J., ECF No. 36, at 31.  Not so.  As the Court just discussed, the Bank developed substantial experience regarding the international and domestic aircraft financing market over the years and leading up to the adoption of the exportable goods screen, and the specific facts learned by the Bank during this time led it to reach the well-supported and reasonable conclusion that aircraft financing applications did not require further in-depth analysis because such financing transactions were unlikely to harm U.S. airlines, which themselves had superior financing alternatives available.  The Bank's predictive judgment — which the Bank Act implicitly requires by focusing on the *likely* adverse effects of a transaction, *see* 12 U.S.C. § 635a-2, and not asking the Bank to determine that a transaction *never* will have any harmful effect — is entitled to substantial deference.

*b. Lack Of Industry Complaints, Changing Market Conditions, And Continued Use Of The Exportable Goods Screen*

Response One also explains that the Bank regularly sought input from industry stakeholders, representatives, and government agencies to help the Bank determine whether its actions were consistent with its fundamental mission of supporting U.S. jobs and exports without causing likely, serious adverse effects on the U.S. economy. *See* AR at 1367, 1375. The Bank believed that such individuals and entities could be relied on to notify the Bank if they became concerned that certain policies or actions threatened to harm a specific domestic industry or sector. *See id.* at 1375. Thus, industry representatives' and stakeholders' concerns — or, more aptly, the lack thereof — were one tool that the Bank used to evaluate (and reevaluate if necessary) the soundness of its categorical judgments. *See id.* ("In the Bank's experience," trade groups, industry stakeholders, and other government agencies "could be relied upon to notify the Bank if they were concerned that the Bank's policies … threatened to cause any harm … to a specific industry or sector."). The Court finds no error in the Bank's decision to rely on such sophisticated and highly interested actors, such as Plaintiffs, for feedback regarding the agency's decisionmaking and predictive judgments over the course of time.

On this point, the Bank reports that when the exportable goods screen first was adopted in 2001, the Bank had not heard any concerns from U.S. airlines regarding adverse economic impact from a Bank financing decision in the last seventeen years (since Pan American World Airways ("Pan Am") complained in 1984), *see id.* — or, for that matter, in the decade following the screen's adoption as well. *See id.* at 1376. The Bank relied on this lack of complaints from industry stakeholders, including Delta and Hawaiian, as further evidence confirming the accuracy of its assessment that U.S. airlines were not experiencing a material financing

43

disadvantage in aircraft transactions as compared to the foreign airlines that received ECA financing.[24]  *See id.* at 1375.

Plaintiffs, however, assert that Response One does not sufficiently explain why the Bank continued to use the exportable goods screen into 2007, or why the Bank kept using the screen at the time of the Five Transactions.  *See* Pls.' Mem. Opp'n Mot. Summ. J., ECF No. 36, at 31-32. Without doubt, an agency's "latitude to make policy based upon predictive judgments deriving from its general expertise … implies a correlative duty to evaluate its policies over time[.]" *Bechtel v. FCC*, 957 F.2d 873, 881 (D.C. Cir. 1992) (citations omitted).  But here, the Court disagrees with Plaintiffs' contention, as Response One clearly explains that the Bank retained the exportable goods screen in the 2007 EIPs and through the adoption of the 2013 EIPs and Guidelines because, despite changes in the dynamics of the aircraft financing market (and still without any industry complaints for much of this time), the Bank's continued expertise and experience indicated that the screen remained an accurate, effective, and efficient tool for evaluating proposed aircraft financing transactions.

For instance, Response One explains that the terrorist attacks of September 11, 2001, resulted in a sudden and protracted reduction in demand for airline passenger services.  *See* AR at 1378.  As a result of that decrease in demand, as well as other financial pressures at the time, U.S. airlines began a decade-long process of consolidation through mergers and bankruptcies. *See id.*  Thus, with limited exceptions, U.S. airlines generally did not purchase new passenger aircraft during this period, such that any financing advantage that the Ex-Im Bank purportedly

---

[24]  The *Delta II-IV* series of litigation appears to support the Bank's position that most U.S. airlines still do not object to the exportable goods screen, as only Delta and Hawaiian have joined these lawsuits, not the Air Transport Association of America or any of its other member airlines.

was providing to foreign airlines during this period remained purely theoretical. *See id.* And, at the same time, the Bank's keen awareness of the aircraft financing market continued to indicate that U.S. airlines still typically had access to financing that was "no less favorable than financing provided by ECAs[.]" *See id.* Under such circumstances, the Court finds that the Bank had no reason to adjust its procedures.

Starting in 2005, moreover, the various countries and constituencies that were involved with ECA aircraft financing, including multiple U.S. airlines, began negotiating a new ASU. *See id.* When the new ASU was agreed to in June 2007, the European airlines, many of which had previously alleged that ECA financing was, in fact, more favorable than the financing they could obtain in the private market, agreed that the new ASU no longer posed any ECA financing advantage. *See id.* At the same time, none of the U.S. airlines expressed any economic impact concerns about the new ASU. *See id.* Thus, with this new ASU in place and with no other significant changes to the aircraft financing market, the Bank again had no reason to believe that a different approach was required through 2007. *See, e.g.*, *id.* ("All of the other relevant factors that led to the adoption of the 'exportable goods' screen in 2001 remained true in 2007.").

Response One further explains that the worldwide financial crisis that first emerged in 2008, as well as the European sovereign debt and banking crises that emerged soon after, also had a major impact on global financial markets, including those for aircraft purchases. *See id.* at 1378-79. During this period, there continued to be little demand for acquiring new passenger aircraft by U.S. airlines, while there was significant growth in the demand for wide-body aircraft in the emerging markets and resource-rich OECD countries. *See id.* at 1379. Plaintiffs fail to explain how any of these changing conditions suddenly required the Bank to reconsider the

exportable goods screen, or why that screen was no longer an effective tool for complying with and achieving the goals of the Bank Act.

For these reasons, the Court is not persuaded by Plaintiffs' argument that Response One relied on outdated information to explain why the Bank continued to use the exportable goods screen through 2007 and beyond, as the Bank has thoroughly explained the factors that it took into consideration and why it did not make any change to its procedures sooner. Given this period of market volatility, the minimal demand for new passenger aircraft by U.S. airlines, the continued lack of industry complaints, and the Bank's understanding that U.S. airlines still generally had access to more favorable financing, the Court finds that the Bank was reasonable to conclude that a different approach was not required.

### c. The First Industry Complaint In 2010

Next, Plaintiffs argue that by 2010, one U.S. airline — Delta — had complained about the financing the Bank was providing to foreign airlines, which, according to Plaintiffs, should have led the Bank to eliminate the exportable goods screen — particularly given the Bank's reliance in Response One on the fact that it had heard no complaints from industry stakeholders prior to 2010. *See* Pls.' Mem. Opp'n Mot. Summ. J., ECF No. 36, at 32-33. The Court, however, finds that the Bank has justified its decision to maintain the exportable goods screen in the face of this industry complaint for at least two reasons: first, the Bank found little merit in the U.S. airline's complaint that financing provided by the Bank to a European airline, Ryanair, was more favorable than the financing available to the U.S. airline; and second, the Bank understood that, in 2010, negotiations among the ECAs for a new ASU would address any perceived cost advantage because the clear aim of the revised ASU was to ensure the equivalency of ECA and commercial bank financing.

Turning to the first point, in early 2010 the Bank received a complaint from one U.S. airline asserting that financing provided by the Bank to Ryanair, a discount European carrier, was more favorable than the financing available to the U.S. airline. *See* AR at 1379. Plaintiffs argue that this complaint should have led the Bank to eliminate, or at least reconsider, the exportable goods screen. *See* Pls.' Mem. Opp'n Mot. Summ. J., ECF No. 36, at 32-33. The Bank, however, has provided a well-reasoned explanation for why this complaint was unfounded: after receiving the complaint, the Bank determined that Ryanair had a better credit rating and was using a superior quality of collateral, namely new aircraft, as compared to the credit rating of the complaining U.S. airline and the relatively older aircraft that the U.S. airline was using as collateral. *See* AR at 1379. These two factors created a material difference in the cost of financing for Ryanair versus that for the complaining U.S. airline, thus discrediting Plaintiffs' analysis as comparing "apples-to-oranges."[25] *See id.*

Second, at around the same time, the complaining U.S. airline also had expressed concerns in the context of the new ASU negotiations. *See id.* The Bank, however, anticipated that the negotiations among the ECAs for a new ASU would address any cost advantage because

---

[25]     Specifically, Ryanair sought to *purchase* seven *new* Boeing 737-*800* aircraft, as compared to Delta's *refinancing* of two *2009* Boeing 737-*700* aircraft. *See* AR at 1379. As the Bank explains (and as basic accounting principles make evident), the financing costs with new airplanes as collateral will be lower than the costs when refinancing with older, less-desirable airplanes as collateral. *See id.* at 1379, 1779. In addition, Plaintiffs' analysis incorrectly compares financing costs for Delta, a non-investment grade airline at the time, with costs for Ryanair, an investment grade foreign airline, which also accounts for part of the difference in financing costs, as different credit ratings obviously will lead to different lending terms. *See id.* at 1379, 1779. Plaintiffs' assertions that Delta and Ryanair had "similar" credit ratings and that the aircraft were "similar" simply are not accurate. (Also absent from Plaintiffs' comparison were the other terms and conditions imposed by the Bank on Ryanair, which restricted the airline's liquidity and altered the ultimate financing costs, including, for example, the requirement of cross-collateralization among all the aircraft in Ryanair's fleet financed by the Bank. *See* Defs.' Reply Supp. Mot. Summ. J., ECF No. 37, at 27-28 n.13; *see also* AR at 1413 n.14 (discussing cross-collateralization requirement for Air India transactions).)

the plain purpose of the new agreement was to ensure the equivalency of ECA and commercial bank financing. *See id.* at 1379-80. The ECAs ultimately reached a new agreement at the end of 2010, and the new ASU went into effect on February 1, 2011. *See id.*; *see also id.* at 2073-119 (2011 ASU). The 2011 ASU contained mechanisms for adjusting to changes in the private financial markets as they occur, thus ensuring that ECA financing and private bank financing remained functionally equivalent. *See id.* at 1379-80; *see also id.* at 2076 (one purpose of the 2011 ASU is "to establish a balanced equilibrium" that "[a]voids distortion of competition among the Participants to this [ASU] and any other sources of financing"). Accordingly, at the time the transactions at issue in this case were approved (October 2012 through February 2013), the new ASU had been in place for a short period of time, and there was no reason to doubt that it was functioning as intended.

Overall, then, when the Bank received a complaint in 2010, it considered the U.S. airline's claims and concluded that the complaint was unfounded and did not require revisiting the exportable goods screen. Further, the mere fact that a U.S. airline, for the first time in nearly two decades, disagreed with the Bank's longstanding judgment about the economic impact of financing aircraft transactions did not, by itself, give the Bank reason to discontinue using the exportable goods screen.[26] *Cf. State Farm*, 463 U.S. at 42 ("an agency changing its course … is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance"). Indeed, to hold otherwise would place the Bank at

---

[26] The Court points out that although the exportable goods screen, like the 2013 EIPs and Guidelines, did not undergo notice-and-comment procedures, interested parties still had other opportunities to provide input to the Bank in the absence of such formalities. *See, e.g.*, AR at 1372 (discussing the Bank's consultation process with U.S. industry, labor, exporters, relevant experts, and government agencies, as well as the Bank's Advisory Committee). As proof, the Bank has received complaints from U.S. airlines in the past, including a complaint in 1984 from Pan Am and the more recent complaint from Delta. *See id.* at 1375.

the whim of the U.S. airline industry, rather than allowing the Bank to carry out its statutory

mandate within the broad and forgiving contours provided by Congress.  *See West Virginia v.*

*EPA*, 362 F.3d 861, 867 (D.C. Cir. 2004) ("agency determinations based upon highly complex

and technical matters are entitled to great deference" (quotation marks and brackets omitted)).

 *d.  The Proper Comparison For Determining Adverse Impact Under The Bank Act*

 Finally, Plaintiffs argue that the Bank should measure the potential advantage Ex-Im

Bank financing may provide to foreign airlines by comparing the difference between the Bank

financing available to the foreign airline and the private market rate that the foreign airline would

have received absent Bank support; the Bank, on the other hand, compares the cost of ECA

financing available to the foreign airlines with the cost of financing that might be available to

U.S. airlines.[27]  *See* Pls.' Mem. Opp'n Mot. Summ. J., ECF No. 36, at 34.  According to

Plaintiffs, if the foreign airline did not have access to the Bank's financing, U.S. airlines would

be in a better position to compete and to hire more employees, and when the availability of Bank

financing removes that advantage, U.S. airlines and their employees suffer.  *See id*.  This

argument, however, appears to rely on two broad assumptions, neither of which holds up under

closer scrutiny: first, if a foreign airline uses Ex-Im Bank financing support, that must mean the

---

[27] The Court notes that Plaintiffs in this case have flipped their position from prior litigation, as the plaintiffs in *ATA* recognized that the Bank's approach represented the correct comparison.  *See* Am. Compl., *ATA*, No. 11-cv-2024, ECF. No. 35, ¶ 6 ("The Ex-Im Bank's aggressive approach to aircraft financing allows foreign airlines to borrow at much cheaper rates *than domestic airlines*." (emphasis added)); ATA's Mem. Supp. Mot. Summ. J., *ATA*, No. 11-cv-2024, ECF No. 32, at 8 (arguing that the Bank "guarantees loans for foreign airlines to purchase new aircraft at rates substantially lower *than U.S. airlines receive* in the open market," and that "[t]hose below-market rates give foreign airlines *competitive advantages over U.S. airlines*" (emphasis added)); *see also ATA*, 878 F. Supp. 2d at 57 ("[T]he Bank's financing of foreign airlines' aircraft purchases allow[ed] foreign airlines to borrow *at better terms than Delta and other domestic airlines*." (emphasis added)).  Such inconsistencies serve to undermine Plaintiffs' arguments and highlight the ambiguity in the Bank Act.

Bank's financing is cheaper than that which the foreign airline could otherwise obtain in the private market; and second, the foreign airline's alleged financing cost advantage over U.S. airlines from Bank financing — an advantage that the Bank explains does not exist in the first place — necessarily causes the type of harm that is relevant under the Bank Act. Ultimately, the Court finds that the Bank's approach is reasonable under the Bank Act, despite Plaintiffs' preference for an alternative methodology that surely would be more favorable to them. *See Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 73 (D.C. Cir. 2011) (judicial review of an agency's selection of alternatives requires "considerable deference to the agency's expertise and policy-making role," and courts must avoid an "unreasonably narrow definition of objectives that compels the selection of a particular alternative" (internal citations and quotation marks omitted)).

Initially, Plaintiffs' argument appears to assume that the existence of Ex-Im Bank financing, by itself, induces foreign airlines to purchase new aircraft and thus increase competition with U.S. airlines. Such a conclusion, however, is inconsistent with the fact that the pricing advantage offered by Bank financing, if any, most likely is immaterial in the larger context of the costs for purchasing, operating, and maintaining wide-body passenger aircraft. *See* AR at 1420-21. As the Bank explains, a single Boeing 787 aircraft costs approximately $116 million to purchase and approximately $40-$70 million to operate annually, *see id.* at 1419 n.26, 1420, which translates to more than $1 billion over the course of its expected 25-year lifetime. *See id.* at 1421. When compared to the hypothetical interest savings per year from Bank support — approximately $482,000 in the case of the Air India transactions, for instance — the Bank's experience has revealed that "[n]o prudent airline would make an investment of that magnitude, and take on such massive operating costs, based solely on the theoretical savings in financing

costs." *Id*. at 1420; *see also* Boeing's Amicus Curiae Br., *Delta IV*, No. 14-cv-0042, ECF No. 19, at 19 ("In Boeing's experience, the Bank was correct in concluding that '[i]t is highly unlikely that' the availability of [ECA] financing 'would induce an airline to make a purchasing decision of this magnitude.'" (citation omitted)).  The record therefore contradicts Plaintiffs' presumption that the availability of Ex-Im Bank financing sways foreign airlines to purchase new aircraft they otherwise would not acquire, thereby causing an increase in competition with U.S. airlines that otherwise would not exist.  Rather, the availability of Bank financing — or the lack thereof — is more likely to affect only the secondary decision of whether to purchase aircraft from Boeing or Airbus when a specific need for new planes arises.  *See* AR at 1421. Thus, Plaintiffs' underlying assumption, that U.S. airlines necessarily face less competition if the Bank does not provide financing to foreign airlines, falls apart.

This ties into another problem with Plaintiffs' alternative comparison: it overlooks the fact that in the market for large commercial aircraft, there are only two manufacturers in the world — Boeing and Airbus — and purchases of Airbus aircraft are supported by three European ECAs (France, Germany, and the United Kingdom).  *See id*. at 1390, 1420-21.  As a result, once a foreign airline decides to purchase a new plane to meet a specific need, the airline has a binary choice: purchase a U.S.-manufactured Boeing airplane (potentially financed by the Ex-Im Bank), or purchase a foreign-manufactured Airbus airplane (potentially financed by a European ECA). *See id.* at 1420 ("Given the competition from Airbus on every sale, supported by the three European ECAs, Ex-Im Bank financing affects only the *sourcing* of an aircraft, not the decision or ability of a foreign airline to purchase an aircraft." (emphasis in original)).  And if Ex-Im Bank financing is removed from the equation, the Bank's experience has revealed that foreign

airlines simply will purchase from Airbus instead of Boeing due to the presence of foreign ECA financing.  *Id*. at 1402.  As the Bank explains,

> [i]n such case, the foreign airline will most likely still purchase an aircraft, but it will be a European-manufactured Airbus aircraft; and it will most likely still use that European-manufactured Airbus aircraft in the same manner as it would have if it had purchased a U.S.-manufactured Boeing aircraft with Ex-Im Bank support. Indeed, many of the foreign airlines that have received Ex-Im Bank support readily switch between Boeing and Airbus and have a mixed fleet of Boeing and Airbus aircraft.  Even the very few foreign airlines that traditionally have only either Boeing or Airbus aircraft can be persuaded to switch.

*Id*.  Thus, Plaintiffs' approach is misguided because, by focusing on the benefit a foreign airline might receive from commercial market financing, it ignores the fact that, in the absence of Bank financing, the foreign airline still will compete with U.S. airlines to the same degree by purchasing Airbus aircraft with foreign ECA financing.[28]  The Bank Act, however, is concerned only with Bank financing that is *likely* to cause *serious* harm to the domestic economy, which is not the case when the presence or absence of Bank financing only alters the aircraft sourcing decision, not the amount of overall competition, such that the only reasonably likely effect from

---

[28]  Plaintiffs attempt to undermine Defendants' assumption that foreign airlines will readily switch between Airbus and Boeing planes by arguing that certain airlines still will purchase Boeing planes regardless of whether Bank financing is available because these airlines maintain all-Boeing fleets for various reasons.  *See* Pls.' Mem. Supp. Mot. Summ. J., ECF No. 31-1, at 32 n.20 ("[T]he Bank's assumption would not hold true if … the foreign airline is committed to maintaining a Boeing fleet"); AR at 1737 ("[S]ome foreign airlines do not use Airbus airplanes.").  Though a few airlines may maintain Boeing-only fleets, that fact only shows that there may be some limited exceptions to the general rule, but the Bank is required to make its assessments based on likelihoods, not certainties.  In addition, that an airline has declined to purchase Airbus planes in the past does not guarantee that it will not do so in the future.  *See* Boeing's Amicus Curiae Br., *Delta IV*, No. 14-cv-0042, ECF No. 19, at 20 ("[I]n today's ultra-competitive climate, even historically sole-source airlines will switch from Airbus to Boeing, as Air Canada did earlier this year, and from Boeing to Airbus, as Japan Airlines did last year when it signed a purchase agreement for 31 Airbus A350 airplanes.").

the absence of Bank financing is the loss to the U.S. economy from fewer aircraft manufacturing opportunities.[29]

The Bank instead focuses on the cost of ECA financing available to the foreign airline in order to make certain that the Bank's financing is competitive with that from foreign ECAs such that export opportunities are funneled (through Boeing) to the U.S. economy and not lost to Airbus. *Cf.* Boeing's Amicus Curiae Br., *Delta IV*, No. 14-cv-0042, ECF No. 19, at 21-22 (in 2012, European ECAs "supported an estimated 147 Airbus airplanes valued at over $10 billion. These agencies are not burdened by the onerous requirements that Plaintiffs demand here." (citation omitted)). Plaintiffs' comparison, on the other hand, ignores the reality that, except when Bank financing is likely to cause serious harm domestically (which the Bank has shown is not the case here), the Bank Act's goal is to ensure that competition between Boeing and Airbus occurs based on the price and quality of the aircraft, not the availability of ECA financing. *See, e.g.*, 12 U.S.C. § 635(a)(2) (specifying procedures that the Bank must follow in order for it "to be competitive in all of its financing programs *with countries whose exports compete with United States exports*" (emphasis added)); AR at 1402 ("[a] key determinant is whether foreign ECA support would be available for financing the sales of a foreign competitor to the proposed U.S. exporter"); *see also* Boeing's Amicus Curiae Br., *Delta IV*, No. 14-cv-0042, ECF No. 19, at 25 ("Plaintiffs' approach ignores the fact that commercial financing is not the true alternative for foreign airlines denied Bank support; rather, such airlines will simply take advantage of the

---

[29]     Of course, "because the Bank is designed to facilitate U.S. exports in a competitive global market, it is inevitable that all of its transactions could be said to have ripple effects on the U.S. economy." AR at 1407 n.12. The Bank Act, however, does not prohibit Bank financing that will have just any effect on competition, as Plaintiffs' argument appears to assume. Instead, the statute mandates that the Bank focus its assessment only on transactions *likely* to cause *serious* adverse economic impact.

financing offered by any of the three European [ECAs] to purchase Airbus planes instead.").
Accordingly, the Court finds that the Bank's comparison is reasonable under the statute.

A final assumption by Plaintiffs is that if a foreign airline uses Ex-Im Bank financing, it must mean that the Bank's financing was cheaper than that which the foreign airline could have obtained in the private market.  The accuracy of this assumption, however, largely is negated by the 2011 ASU, which included mechanisms intended to align ECA financing costs with those available in the private market in order that a foreign airline using ECA financing does not obtain a financing cost advantage.[30]  *See* AR at 1379-80.  Plaintiffs nonetheless argue that their own experts have concluded that foreign airlines still obtain substantial cost advantages from ECA financing even under the 2011 ASU, which would contradict the Bank's position that the ASU has been effective in achieving its goal.  *See* Pls.' Mem. Opp'n Mot. Summ. J., ECF No. 36, at 36 & nn.11-12; AR at 1778-80.  The Court is not persuaded by Plaintiffs' argument for two reasons.

First, the Court already has addressed the Ryanair transaction, and in short, nothing about Plaintiffs' analysis discredits the Bank's understanding of the aircraft financing industry or the effectiveness of the 2011 ASU, as the Bank has demonstrated why Plaintiffs' analysis of the

---

[30]     It remains possible that when the size of a transaction is very large, or when private lenders have reached certain lending limits, there may not be private lenders willing or able to undertake the risk, and the foreign airline therefore would need to turn to an ECA.  In such circumstances, the Bank ensures that Boeing does not lose the export opportunity to Airbus, which is supported by the European ECAs.  But even in this situation, it does not necessarily follow that the foreign airline is gaining a financing cost advantage *over U.S. airlines* from Bank financing.  In addition, once a foreign airline buys an Ex-Im Bank financed aircraft, it still may never use the aircraft to compete directly with U.S. airlines, and as the Court explains in its decision in *Delta IV*, the Bank reasonably has determined that only direct competition threatens the type of "serious" adverse economic impact contemplated by the Bank Act.  For example, Air India does not fly any of the Bank-financed Boeing 787 aircraft at issue in *Delta I* to the United States, which led the Bank to conclude in Response Two that the Air India commitments did not seriously harm U.S. airlines.  *See* AR at 1405.

Ryanair transaction is flawed and not compelling.[31]  *See* Part IV.B.3.c., *supra*.  The Court notes,

though, that because airlines continue to use ECA financing at times, those airlines must expect

some benefit to having ECA support such that a difference still seems to exist between ECA

financing and private market financing despite the revised ASU.  Of course, sometimes private

market financing simply is not available to an airline for whatever reason, which explains the

obvious preference for ECA financing in those situations.  At the same time, Plaintiffs have not

brought to the Court's attention any specific transaction conclusively establishing that a material

financing gap actually does exist between the two financing sources, as the only comparisons the

Court finds in the record are the Ryanair comparison, which dealt with financing issued before

the new ASU and which the Court has found unpersuasive for other reasons, and the Air India

comparison in Response Two, which likewise is not persuasive because it provides only a

hypothetical analysis.  Thus, in spite of the Court's slight unease about the actual effectiveness of

the new ASU, the Court finds no basis to overturn the Bank's judgment, particularly given that

the Bank continues to monitor the relationship between ASU-level financing and commercial

market financing.  *See* AR at 1379-80 ("The Bank continues to monitor the 2011 ASU to ensure

that the adjustment mechanism built into that agreement does, in fact, generally work to enforce

---

[31]      Plaintiffs also cite a declaration from a Delta official stating that he conducted an "apples-to-apples comparison" between Delta's EETCs and Ryanair's purchase of new aircraft, "including similar credit ratings, identical collateral, and similar financing dates" in June and November 2010.  *See* Pls.' Mem. Opp'n Mot. Summ. J., ECF No. 36, at 26 n.12 (citing AR at 1796-98).  Such analysis, however, appears to fail to account for the revised 2011 ASU, which was drafted to eliminate the financing discrepancies about which Plaintiffs complain.  In addition, Plaintiffs' declaration does not state whether Delta's private financing again concerned the refinacing of *older* aircraft, which, if true, would render the comparison meaningless.  *See also* n.23, *supra*, explaining why the Bank need not find that U.S. airlines always can obtain more favorable private financing in order to uphold the categorical screen.

an equilibrium between the cost of ECA aircraft financings and the financing available to U.S.

airlines in the private market.").

Second, Plaintiffs' argument ties into a larger theme that is prevalent throughout this

litigation: many of Plaintiffs' complaints about the Bank are, at base, an attempt to provoke a

battle of the experts.  But such a battle is frowned upon within the context of an APA challenge

to agency decisionmaking.  *See Marsh*, 490 U.S. at 378 ("When specialists express conflicting

views, an agency must have discretion to rely on the reasonable opinions of its own qualified

experts even if, as an original matter, a court might find contrary views more persuasive.");

*Mississippi v. EPA*, 744 F.3d 1334, 1348 (D.C. Cir. 2013) ("We repeat: it is not our job to referee

battles among experts; ours is only to evaluate the rationality of EPA's decision[.]"); *Envtl. Def.*

*v. U.S. Army Corps of Eng'rs*, 515 F. Supp. 2d 69, 82 (D.D.C. 2007) (agency's "reasoning is

disputed, but the dispute presents a battle of experts — a battle conducted in an arena that is off

limits to APA judicial review").  This is not to say that the Court has dismissed, or ought to

dismiss, outright Plaintiffs' own expertise and counterfactual arguments; the Court, however,

must give the appropriate deference to the Bank's experience and judgment, especially when

each side's experts might reach different conclusions.  Doing otherwise would entangle the Court

in the forbidden expert battle and not give the agency the deference that Congress has afforded to

it by law.

*         *         *

In sum, the Court finds that the Bank's adoption and continued use of the exportable

goods screen in the 2007 EIPs and beyond constituted rational agency decisionmaking.

Specifically, the Bank used its experience and expertise to make a reasonable predictive

judgment that balanced the Bank Act's two competing directives — to consider the likelihood of

substantial economic impact on domestic industry and to process financing transactions in an efficient and competitive manner that funnels critical export opportunities to the U.S.  Indeed, the screen enabled the Bank to resolve financing applications with the promptness that commercial airlines demand, while also allowing the Bank to focus its limited resources on conducting in-depth economic analysis only on those transactions that it reasonably deemed to be the most likely to cause a serious adverse effect, as the Bank Act permits.  As such, the exportable goods screen represented an appropriate, reasonable, and efficient response to the realities of the domestic and international markets for aircraft financing.  Though Plaintiffs and their experts may disagree with the Bank's analysis and interpretive decisions, deference is owed to the Bank's creation of internal procedures that fill in the many gaps left by Congress in the Bank Act.  Accordingly, because the Court finds that the exportable goods screen constitutes reasonable agency decisionmaking and falls within the parameters of the Bank Act, the Court finds in favor of Defendants on this issue.

**C.  The Bank Did Not Err By Applying The 2007 EIPs To Approve The Five Transactions**

The Court next turns to an important procedural question raised by Plaintiffs: whether the Bank originally should have evaluated the Five Transactions, which were approved between October 2012 and February 2013, under the 2013 EIPs and Guidelines, rather than under the 2007 EIPs.  *See, e.g.*, Compl. ¶¶ 55-56.  Defendants respond that the Board's decision to delay the effective date of the 2013 EIPs and Guidelines until April 1, 2013, was reasonable and within the Board's discretion, and the Bank therefore also was reasonable to apply the 2007 EIPs to the Five Transactions because those were the operative procedures at the time of the financing decisions, not the 2013 EIPs and Guidelines.  *See* Defs.' Mem. Supp. Mot. Summ. J., ECF No. 30-1, at 34.  The Court agrees with Defendants.

Of note, Plaintiffs do not cite any authority that might have required the Bank to apply procedures that were not officially in effect at the time of a financing decision, nor do Plaintiffs cite any authority that might have required the procedures to become effective at an earlier date. *Cf.* AR at 778 ("The Etihad transaction was considered according to existing policies and procedures…. As a matter of policy, Ex-Im Bank processes its transactions in accordance with the due diligence, analytical, and legal requirements *that exist at such time*." (emphasis added)); *id.* at 1061 (KAL); *id.* at 1311 (LATAM).  Indeed, the Reauthorization Act imposed only one deadline regarding adverse economic impact: the Bank had to develop and make publicly available its guidelines within 180 days of the passage of the Act, which the Bank did.  *See* Reauthorization Act § 12(a).

Further, although the Board adopted the 2013 EIPs and Guidelines in a public meeting on November 19, 2012, *see* AR at 2016, which was before three of the Five Transactions were approved, "an agency may defer the effective date of a regulation just as a court may defer the effective date of a decree enjoining a nuisance, provided there is justification." *ASG Indus., Inc. v. Consumer Prod. Safety Comm'n*, 593 F.2d 1323, 1335 (D.C. Cir. 1979).  Here, Defendants explain that the effective date of the 2013 EIPs and Guidelines was delayed for several months in order to provide a transition period in which parties seeking the Bank's financing, as well as the Bank's staff, could prepare for and adapt to the new procedures.  *See* Defs.' Mem. Supp. Mot. Summ. J., ECF No. 30-1, at 34.  Importantly, Stage I of the aircraft-specific procedures in the 2013 EIPs and Guidelines required an expert analysis of the long-term supply and demand dynamic within the airline industry in order to determine whether structural oversupply exists. *See* AR at 1453.  This analysis was required to be conducted before the 2013 EIPs and

Guidelines could be applied because only when oversupply exists does the next stage of the review process require aircraft transactions to undergo further, case-specific analysis.  *Id.*

The 2013 EIPs and Guidelines, moreover, required this oversupply analysis to be conducted by "an independent, external source recognized as an expert (and neutral party) in the airline field," *id.*, and the Bank therefore needed time to retain the outside expert, *see id.* at 1422, and then additional time was needed for the expert to perform the analysis.  In the end, the oversupply analysis was completed on March 19, 2013, just a few days before the effective date of April 1.  *See id.* at 2120-39.  Based on this explanation, and without any compelling argument to the contrary, the Court is satisfied that the Board's decision to set April 1, 2013, as the effective date for the new procedures was "justif[ied]" and reasonable under the circumstances. *ASG Indus.*, 593 F.2d at 1335.  As such, the Bank also was reasonable to apply the 2007 EIPs to the Five Transactions because the 2013 EIPs and Guidelines were not yet ready and effective at the time of the relevant financing decisions, all of which occurred before April 1, 2013.

\*      \*      \*

To summarize, the Court has reached three conclusions today: first, the Court may consider Response One as a legitimate articulation of the Bank's justifications for the 2007 EIPs; second, the 2007 EIPs satisfy the requirements of the APA, the Bank Act, and the Reauthorization Act; and third, the Bank acted reasonably in applying the 2007 EIPs, rather than the 2013 EIPs and Guidelines, when it originally authorized the Five Transactions.  As a result of these three conclusions, the Court finds that Defendants have successfully defended the Bank's authorizations for the Five Transactions in the face of Plaintiffs' lawsuit, as the Court finds no errors in the agency's actions in making those commitments.  Accordingly, the Court grants summary judgment in favor of Defendants as to Plaintiffs' Counts I, II, and III, which allege that

the Bank's approval of the Five Transactions violated the APA, the Bank Act, and the Reauthorization Act.

Further, the Court finds that consideration of the Remand Analyses and the 2013 EIPs and Guidelines in this litigation would be necessary only if the Court were to have concluded that the Bank should have applied the new EIPs to the Five Transactions at the time of the original financing authorizations. The Court, moreover, agrees with Defendants' assertion that the Remand Analyses were prepared only "to confirm the reasonableness of the Board's prior decisions" to approve the Five Transactions under the 2007 EIPs, *see* Defs.' Mem. Opp'n Mot. Summ. J., ECF No. 35, at 12, and the Remand Analyses therefore do not, and never were intended to, represent new authorizing decisions for those transactions. *See also* Defs.' Reply Supp. Mot. Summ. J., ECF No. 37, at 7 (explaining that "no authority required the Board to vote to adopt papers prepared in response to litigation as if the Board were approving new transactions"). Instead, the Remand Analyses represented the Bank staff's analysis and recommendation to the Board that the Board did *not* need to reconsider its original authorizations for the Five Transactions because those financial commitments would have been approved under the 2013 EIPs and Guidelines as well. *See* AR at 2145-47 (memorandum from the Bank's staff recommending that the Board adopt the Remand Analyses). Consequently, the Board's unanimous vote to ratify and adopt the Remand Analyses in April 2014 only represented the Board's agreement with the staff's recommendation as to the consequences of applying the new EIPs to the Five Transactions, not a vote by the Board to authorize the financing commitments for a second time under the 2013 EIPs and Guidelines. *See id.* at 2312.

Thus, because the Remand Analyses represented the agency's alternative evaluation on remand and not any reconsideration or reauthorization of the Five Transactions, addressing the

Remand Analyses and the 2013 EIPs and Guidelines now would amount to little more than an advisory opinion to the agency regarding its new procedures.  As proof, even if the Court were to conclude that Defendants erred at some point along the way in regard to the 2013 EIPs and Guidelines, there still would be no basis for vacating the Five Transactions because the Court already found that the agency properly authorized those transactions under the substantively valid 2007 EIPs.  *See, e.g*., *FCC v. Pacifica Found.*, 438 U.S. 726, 735 (1978) ("…federal courts have never been empowered to issue advisory opinions."); *Nat'l Wildlife Fed'n v. Hodel*, 839 F.2d 694, 742 (D.C. Cir. 1988) ("It would be entirely inappropriate for this court to do as [the plaintiff] suggests and issue an advisory opinion to guide the [agency's] rulemaking.").  In addition, the Court is especially weary of engaging in any superfluous alternative inquiry into the 2013 EIPs and Guidelines due to the numerous complex and highly-technical issues that the Court would need to address in order to resolve the merits of the new procedures.  The Court's analysis therefore can, and must, stop here.

## V.  CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion for summary judgment and denies Plaintiffs' motions.[32]  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

---

[32]     Plaintiffs also have filed a motion to compel discovery (ECF No. 19) in which they seek discovery regarding alleged "communications between the Bank, the Boeing Company, and the five foreign airlines whose Bank-subsidized purchases of Boeing planes are the subject of this action."  *See* Pls.' Mem. Supp. Mot. Compel Disc., ECF No. 19-1, at 1.  In an APA lawsuit, discovery into an agency's decisionmaking process typically is limited to two exceptional circumstances: first, "when the record is so bare that it prevents effective judicial review," *Baptist Mem'l Hosp. v. Sebelius*, 566 F.3d 255, 230 (D.C. Cir. 2009); and second, when there is a "strong showing of bad faith or improper behavior." *Overton Park*, 401 U.S. at 420. The Court finds that Plaintiffs have failed to establish the existence of either circumstance here. In addition, Plaintiffs seek this discovery on the basis that it is "highly relevant to the Court's

Dated:  March 30, 2015                                RUDOLPH CONTRERAS
                                                      United States District Judge

---

efforts to craft a remedy in this case should the Bank fail to justify its loan guarantees." *See* Pls.'
Mem. Supp. Mot. Compel Disc., ECF No. 19-1, at 10.  The Court, however, has upheld the
Bank's actions; consequently, the requested discovery now is irrelevant.  The Court therefore
denies Plaintiffs' motion for discovery.  Plaintiffs also have filed a motion to supplement the
administrative record with their expert oversupply report, which originally was excluded from
the record.  *See generally* Pls.' Mot. Suppl. Admin. R., ECF No. 32.  Plaintiffs' expert report,
however, was included in Defendants' supplemental administrative record because the report
was part of the materials presented to the Board prior to its vote on the remand papers.  *See*
Defs.' Suppl. Mem. Supp. Mot. Summ. J., ECF No. 46, at 17 & nn.10-11.  Accordingly, the
Court denies Plaintiffs' motion as moot on this basis, as well as on the basis that the expert report
is relevant only to the 2013 EIPs and Guidelines, which the Court does not address today.